# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| H.T., through and with her next friend and mother, L.T.; B.W., through and with his next friend and father, W.W.; KEVIN WILLIAMSON; SUSAN MISHANSKI; M.Y., through and with her next friends and parents, M.B.Y. and J.Y.; P.S., through and with his next friend and mother, A.S.; S.S. through and with his next friend and mother, R.K.; JESSICA VAN REETH; JACK VAN REETH; M.K., through and with his next friend and father, J.F.K; CHARLES BALASAVAGE, JR.; CHARLES and JOANNE BALASAVAGE; JESSE BALLIET; SARAH MYERS; FRANK WEBER; FLORENCE MYERS; STEVE BRANNIGAN; LISA BRANNIGAN; JEFFREY BRUNO; JAY BRUNO; SCOTT BUKOSKI; D.C., through and with his next friend and mother, R.C.; RUTH DAVIS; CAROL FRONCZEK; WILLIAM DIXON; J.G., through and with his next friend and mother, M.O.; BRIAN GYLE; WAYNE GYLE; TRACY HARVEY; D.J., through and with his next friend and mother, S.J.; BARBARA KEARNS; JESSICA THURSTON; BARBARA THURSTON; | COMPLAINT – CLASS ACTION<br><br>Civil Action No.<br><br>JURY TRIAL DEMANDED |

KURT KRUGER; J.M.K., through and
with his next friend and mother, B.T.;
EDWARD KENZAKOSKI III; J.K.,
through and with his next friend and
father, A.K.; B.L., through and with his
next friend and father, M.L.; ANTHONY
MILLAN; DAMON MILLAN; CINDY
MILLAN; PAUL MORGAN JR.;
STEVEN PALCHANIS JR.; STEVEN
PALCHANIS SR.; JAMIE QUINN; K.R.,
through and with his next friend and
mother, T.S.; DAVID ROWLANDS;
MARY SEVILLE; MICHAEL S.
SCARLATO; MICHAEL P. and TINA
SCARLATO; A.S., through and with his
next friend and father, G.S.; JAMES
SWARTLEY; MICHAEL VITALI;
M.M.W., through and with her next friend
and guardian, J.C.; JOHN ASHFORD
JR.; DONNA ASHFORD; SHANE BLY;
G.B., through and with his next friends
and parents J.B. and P.P.; DARYL
CHARLES; LIZA CHARLES;
WILLIAM CLARKE;GLENN COOPER;
KAREN COOPER; RICHARD
COPELAND II; DONNA and RICHARD
COPELAND; CHAD DERHAMMER;
A.D., through and with her mother and
next friend, J.E.; MATTHEW
DOUGHERTY; E.E., K.E., and L.E.
through and with their mother and next
friend, H.E.; A.F. and L.F. through and
with their mother and next friend, M.F.;
J.D.F., through and with his next friend
and mother, M.W.; J.F., through and with
his next friend and mother, A.I.K.;
ALEXANDRA FAHEY; L.H., through
and with her next friend and mother, J.M.;
MICHAEL HAINES; BARBARA
HAINES; EDWARD KANE, JR.;

BRIANNA KEE; MATTHEW
KOPETCHNY; MAGEE MOTT; G.M.,
through and with his next friend and
mother, F.M.; KRYSTAL POPE; LISA
SCARBROUGH; LAURIE
SCARBROUGH; MARSHOND
SEWARD; J.S. through and with his next
friend and mother, C.S.; CHAD UCA;
W.U., through and with his next friend
and mother, D.S.; B.R.W., through and
with his next friends and parents, C.W.
and S.W., on behalf of themselves and all
others similarly situated,

       Plaintiffs,

   v.

MARK A. CIAVARELLA, JR.;
MICHAEL T. CONAHAN; ROBERT J.
POWELL; ROBERT MERICLE;
GREGORY ZAPPALA; CINDY
CIAVARELLA; BARBARA
CONAHAN; MERICLE
CONSTRUCTION, INC.; MID-
ATLANTIC YOUTH SERVICES; PA
CHILD CARE, LLC; WESTERN PA
CHILD CARE, LLC; PINNACLE
GROUP OF JUPITER, LLC; VISION
HOLDINGS, LLC; BEVERAGE
MARKETING OF PENNSYLVANIA,
INC.,

       Defendants.

## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.   With utter disdain for the rule of law, defendants Mark A. Ciavarella, Jr.

and Michael T. Conahan, in combination and conspiracy with other

defendants named herein, have collectively perpetrated, through their acts

and omissions, what ranks as one of the largest and most serious violations

of children's rights in the history of the American legal system.  Both in its

duration, spanning approximately five years between 2003 and 2008 – and

its magnitude, inflicting damage on the lives of thousands of children and

their families – the scope of defendants' unlawful scheme is profoundly

shocking.  In choosing to treat children as commodities that could be traded

for cash, the defendants have placed an indelible stain on the Luzerne

County juvenile justice system.

2.   Specifically, defendants Ciavarella and Conahan engaged for years in a

brazen scheme to accept financial kickbacks from defendants Powell,

Mericle, and others in exchange for placing children appearing before

Ciavarella in residential programs owned and operated by defendants

Powell and Zappala, PA Child Care LLC, Western PA Child Care LLC,

and Mid-Atlantic Youth Services.  As part of the implementation of this

scheme, Ciavarella, in concert with other defendants, routinely deprived

children of their constitutional rights – established for decades – to appear before an impartial tribunal, to be represented by counsel, to be protected against self-incrimination and, through a detailed colloquy with the Court, to insure a knowing, intelligent and voluntary waiver of trial rights before pleading guilty.

3.      The fact that the victims of the defendants' misconduct were children who went before the juvenile court expecting justice and fairness only exacerbates the venality of defendants' conduct.  Instead of due process, thousands of these children, among the most vulnerable members of our society, were victims of a wave of unprecedented lawlessness that within minutes of their court appearances, swept them away in handcuffs and shackles and placed them in detention or other residential facilities for months for infractions as trivial as shoplifting a four dollar jar of nutmeg or taking change from unlocked cars.  The abuse and trauma these children suffered at the hands of defendants has dramatically changed the trajectory of many of their lives.

4.      Confronted as we are in this case with the wholesale subversion of children's constitutional rights at the hands of the very public officials, elected judges, charged with enforcing and protecting those rights, the due process clause has never been more relevant; the principle that no

individual is above the law has never been more compelling.  This case requires that we squarely confront these two fundamental principles of our own constitutional tradition.

5.      These defendants have shamed the face of justice; plaintiffs now come before this court to seek redress.

## JURISDICTION

6.      Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4), in that claims are brought under 42 U.S.C. § 1983 for the redress of rights secured by the United States Constitution and under 18 U.S.C. § 1964 for civil violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

7.      Plaintiffs' claims for compensatory and punitive damages are authorized by 18 U.S.C. § 1964 and 42 U.S.C. § 1983.

8.      Plaintiffs' claims for attorneys' fees are authorized by 42 U.S.C. §§ 1983 and 1988 and 18 U.S.C. § 1964(c).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the plaintiffs reside in this district, the defendants are located in this district, and the acts and omissions giving rise to the claims herein occurred in this district.

## PARTIES

### Plaintiffs

10.   Plaintiff H.T. of White Haven, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

11.   Plaintiff L.T. of White Haven, Pennsylvania is the next friend and mother of Plaintiff H.T.

12.   Plaintiff B.W. of Mountain Top, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

13.   Plaintiff W.W. of Mountain Top, Pennsylvania is the next friend and father of Plaintiff B.W.

14.   Plaintiff KEVIN WILLIAMSON of Hanover Township, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

15.   Plaintiff SUSAN MISHANSKI of Hanover Township, Pennsylvania is the mother of Plaintiff KEVIN WILLIAMSON.

16.   Plaintiff M.Y. of Sugarloaf, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

17.    Plaintiffs M.B.Y. and J.Y. of Sugarloaf, Pennsylvania are the next friends and parents of Plaintiff M.Y.

18.    Plaintiff P.S. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

19.    Plaintiff A.S. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff P.S.

20.    Plaintiff S.S. of Wilkes-Barre, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

21.    Plaintiff R.K. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff S.S.

22.    Plaintiff JESSICA VAN REETH of Mountain Top, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

23.    Plaintiff JACK VAN REETH of Mountain Top, Pennsylvania is the father of Plaintiff JESSICA VAN REETH.

24.    Plaintiff M.K. of Exeter, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

25.     Plaintiff J.F.K. of Exeter, Pennsylvania is the father and next friend of

        Plaintiff M.K.

26.     Plaintiff CHARLES BALASAVAGE, JR. of Wilkes-Barre, Pennsylvania

        is an eighteen-year-old male who was adjudicated delinquent and/or placed

        by Defendant CIAVARELLA some time between 2003 and 2008.

27.     Plaintiffs CHARLES and JOANNE BALASAVAGE of Wilkes-Barre,

        Pennsylvania are the parents of Plaintiff CHARLES BALASAVAGE, JR.

28.     Plaintiff JESSE BALLIET of Wilkes-Barre, Pennsylvania is a twenty-two-

        year-old male who was adjudicated delinquent and/or placed by Defendant

        CIAVARELLA some time between 2003 and 2008.

29.     Plaintiff SARAH MYERS is a nineteen-year-old female from Wilkes-

        Barre, Pennsylvania who was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

30.     Plaintiff FRANK WEBER is a twenty-three-year-old male from Wilkes-

        Barre, Pennsylvania who was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

31.     Plaintiff FLORENCE MYERS of Wilkes-Barre, Pennsylvania, is the

        mother of Plaintiff JESSE BALLIET, Plaintiff SARAH MYERS, and

        Plaintiff FRANK WEBER.

32.     Plaintiff STEVEN BRANNIGAN is an eighteen-year-old male who resides in Hanover Township, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

33.     Plaintiff LISA BRANNIGAN of Hanover Township, Pennsylvania is the mother of Plaintiff STEVEN BRANNIGAN.

34.     Plaintiff JEFFREY BRUNO is a twenty-one-year-old male who resides in Larksville, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

35.     Plaintiff JAY BRUNO of Larksville, Pennsylvania is the father of Plaintiff JEFFREY BRUNO.

36.     Plaintiff SCOTT BUKOSKI is a twenty-one-year-old male who resides in Nanticoke, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

37.     Plaintiff D.C. of Shickshinny, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

38.     Plaintiff R.C. of Shickshinny, Pennsylvania is the next friend and mother of Plaintiff D.C.

39.  Plaintiff RUTH DAVIS of Shavertown, Pennsylvania is a twenty-two-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

40.  Plaintiff CAROL FRONCZEK of Shavertown, Pennsylvania is the mother of Plaintiff RUTH DAVIS.

41.  WILLIAM DIXON is a twenty-one-year-old male who resides in Plymouth, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

42.  Plaintiff J.G. of Harvey's Lake, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

43.  Plaintiff M.O. of Harvey's Lake, Pennsylvania is the next friend and mother of Plaintiff J.G.

44.  Plaintiff BRIAN GYLE is a nineteen-year-old male who resides in Pittston, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

45.  Plaintiff WAYNE GYLE is a twenty-one-year-old male who resides in Pittston, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

46.     Plaintiff TRACY HARVEY of Harvey's Lake, Pennsylvania is an

        eighteen-year-old male who was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

47.     Plaintiff D.J. of Edwardsville, Pennsylvania is a sixteen-year-old male who

        was adjudicated delinquent and/or placed by Defendant CIAVARELLA

        some time between 2003 and 2008.

48.     Plaintiff S.J. of Edwardsville, Pennsylvania is the next friend and mother of

        Plaintiff D.J.

49.     Plaintiff BARBARA KEARNS of Southern Pines, North Carolina is a

        nineteen-year-old female.  She was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

50.     Plaintiff JESSICA THURSTON of Wilkes-Barre, Pennsylvania is a

        twenty-year-old female who was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

51.     Plaintiff BARBARA THURSTON of Wilkes-Barre, Pennsylvania is the

        mother of Plaintiff JESSICA THURSTON and Plaintiff BARBARA

        KEARNS.

52.     Plaintiff KURT KRUGER is a twenty-two-year-old male who resides in

        Wilkes-Barre, Pennsylvania.  He was adjudicated delinquent and/or placed

        by Defendant CIAVARELLA some time between 2003 and 2008.

53.     Plaintiff J.M.K. of Wilkes-Barre, Pennsylvania is a seventeen-year-old
        male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

54.     Plaintiff B.T. of Wilkes-Barre, Pennsylvania is the next friend and mother
        of Plaintiff J.M.K.

55.     Plaintiff EDWARD KENZAKOSKI III is a twenty-two-year-old male from
        Wilkes-Barre, Pennsylvania.  He was adjudicated delinquent and/or placed
        by Defendant CIAVARELLA some time between 2003 and 2008.

56.     Plaintiff J.K. of Kingston, Pennsylvania is a fifteen-year-old male who was
        adjudicated delinquent and/or placed by Defendant CIAVARELLA some
        time between 2003 and 2008.

57.     Plaintiff A.K. of Kingston, Pennsylvania is the next friend and father of
        Plaintiff J.K.

58.     Plaintiff B.L. of Kinston, Pennsylvania is a sixteen-year-old male who was
        adjudicated delinquent and/or placed by Defendant CIAVARELLA some
        time between 2003 and 2008.

59.     Plaintiff M.L. of Kingston, Pennsylvania is the father and next friend of
        Plaintiff B.L.

60.     Plaintiff ANTHONY MILLAN of Nanticoke, Pennsylvania is a twenty-
        year-old male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

61.     Plaintiff DAMON MILLAN is an eighteen-year-old male who resides in
        Nanticoke, Pennsylvania who was adjudicated delinquent and/or placed by
        Defendant CIAVARELLA some time between 2003 and 2008.

62.     Plaintiff CINDY MILLAN of Nanticoke, Pennsylvania, is the mother of
        Plaintiffs DAMON and ANTHONY MILLAN.

63.     Plaintiff PAUL MORGAN JR., is an eighteen-year-old male from
        Mountain Top, Pennsylvania.  He was adjudicated delinquent and/or placed
        by Defendant CIAVARELLA some time between 2003 and 2008.

64.     Plaintiff STEVEN PALCHANIS JR. of Wilkes-Barre, Pennsylvania is a
        twenty-one-year-old male who was adjudicated delinquent and/or placed
        by Defendant CIAVARELLA some time between 2003 and 2008.

65.     Plaintiff STEVEN PALCHANIS SR. of Wilkes-Barre, Pennsylvania is the
        father of Plaintiff STEVEN PALCHANIS JR.

66.     Plaintiff JAMIE QUINN is an eighteen-year-old female who resides in
        Wyoming, Pennsylvania. She was adjudicated delinquent and/or placed by
        Defendant CIAVARELLA some time between 2003 and 2008.

67.     Plaintiff K.R. of Hanover Township, Pennsylvania is a seventeen-year-old

        male who was adjudicated delinquent and/or placed by Defendant

        CIAVARELLA some time between 2003 and 2008.

68.     Plaintiff T.S. of Hanover Township, Pennsylvania is the mother and next

        friend of Plaintiff K.R.

69.     Plaintiff DAVID ROWLANDS of Laporte, Pennsylvania is an eighteen-

        year-old male who was adjudicated delinquent and/or placed by Defendant

        CIAVARELLA some time between 2003 and 2008.

70.     Plaintiff MARY SEVILLE of Laporte, Pennsylvania is the mother of

        Plaintiff DAVID ROWLANDS.

71.     Plaintiff MICHAEL S. SCARLATO of Hazleton, Pennsylvania is an

        eighteen-year-old male who was adjudicated delinquent and/or placed by

        Defendant CIAVARELLA some time between 2003 and 2008.

72.     Plaintiffs MICHAEL P. and TINA SCARLATO of Hazleton,

        Pennsylvania, are the parents of Plaintiff MICHAEL S. SCARLATO.

73.     Plaintiff A.S. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who

        was adjudicated delinquent and/or placed by Defendant CIAVARELLA

        some time between 2003 and 2008.

74.     Plaintiff G.S. of Wilkes-Barre, Pennsylvania is the next friend and father of

        Plaintiff A.S.

12

75.     Plaintiff JAMES SWARTLEY is a nineteen-year-old male from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

76.     Plaintiff MICHAEL VITALI of Wilkes-Barre, Pennsylvania is a twenty-two-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

77.     Plaintiff M.M.W. of Freedland, Pennsylvania is a fourteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

78.     Plaintiff J.C. of Freedland, Pennsylvania is the next friend and legal guardian of Plaintiff M.M.W.

79.     Plaintiff JOHN ASHFORD JR. of Wilkes-Barre, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

80.     Plaintiff DONNA ASHFORD of Wilkes-Barre, Pennsylvania is the mother of Plaintiff JOHN ASHFORD JR.

81.     Plaintiff SHANE BLY of Sugar Loaf, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

82.     Plaintiff G.B. of Larksville, Pennsylvania is a seventeen-year-old male who
        was adjudicated delinquent and/or placed by Defendant CIAVARELLA
        some time between 2003 and 2008.

83.     Plaintiffs P.P. and J.B. of Larksville, Pennsylvania are the next friends and
        parents of Plaintiff G.B.

84.     Plaintiff DARYL CHARLES of Wilkes-Barre, Pennsylvania is a twenty-
        year-old male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

85.     Plaintiff LIZA CHARLES of Wilkes-Barre, Pennsylvania is the mother of
        Plaintiff DARYL CHARLES.

86.     Plaintiff WILLIAM CLARKE of Bear Creek Township, Pennsylvania is a
        twenty-three-year-old male who was adjudicated delinquent and/or placed
        by Defendant CIAVARELLA some time between 2003 and 2008.

87.     Plaintiff GLENN COOPER of Meshoppen, Pennsylvania is a twenty-one-
        year-old male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

88.     Plaintiff KAREN COOPER of Meshoppen, Pennsylvania is the mother of
        Plaintiff GLENN COOPER.

89.     Plaintiff RICHARD COPELAND II of Sugar Notch, Pennsylvania is a
        twenty-year-old male who was adjudicated delinquent and/or placed by
        Defendant CIAVARELLA some time between 2003 and 2008.

90.     Plaintiffs DONNA and RICHARD COPELAND of Sugar Notch,
        Pennsylvania are the parents of Plaintiff RICHARD COPELAND II.

91.     Plaintiff CHAD DERHAMMER of Dallas, Pennsylvania is a twenty-three-
        year-old male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

92.     Plaintiff A.D. of Plymouth, Pennsylvania is a seventeen-year-old female
        who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

93.     Plaintiff J.E. of Plymouth, Pennsylvania is the next friend and mother of
        Plaintiff A.D.

94.     Plaintiff MATTHEW DOUGHERTY of Pittston, Pennsylvania is a twenty-
        one-year-old male who was adjudicated delinquent and/or placed by
        Defendant CIAVARELLA some time between 2003 and 2008.

95.     Plaintiff E.E. of Wilkes-Barre, Pennsylvania is a fourteen-year-old female
        who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

96.     Plaintiff K.E. of Wilkes-Barre, Pennsylvania is a fifteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

97.     Plaintiff L.E. of Wilkes-Barre, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

98.     Plaintiff H.E. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff L.E., Plaintiff K.E., and Plaintiff E.E.

99.     Plaintiff A.F. of Drums, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

100.    Plaintiff L.F. of Drums, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

101.    Plaintiff M.F. of Drums, Pennsylvania is the next friend and mother of Plaintiff A.F. and Plaintiff M.F.

102.    Plaintiff J.D.F. of Exeter, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

103.    Plaintiff M.W. of Exeter, Pennsylvania is the next friend and mother of
        Plaintiff J.D.F.

104.    Plaintiff J.F. of Nanticoke, Pennsylvania is a fourteen-year-old male who
        was adjudicated delinquent and/or placed by Defendant CIAVARELLA
        some time between 2003 and 2008.

105.    Plaintiff A.I.K. of Nanticoke, Pennsylvania is the next friend and mother of
        Plaintiff J.F.

106.    Plaintiff ALEXANDRA FAHEY is a nineteen-year-old female who resides
        in Pittston, Pennsylvania. She was adjudicated delinquent and/or placed by
        Defendant CIAVARELLA some time between 2003 and 2008.

107.    Plaintiff L.H. of Wilkes-Barre, Pennsylvania is a sixteen-year-old female
        who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

108.    Plaintiff J.M. of Wilkes-Barre, Pennsylvania is the next friend and mother
        of Plaintiff L.H.

109.    Plaintiff MICHAEL HAINES of Dallas, Pennsylvania is a nineteen-year-
        old male who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

110.    Plaintiff BARBARA HAINES of Dallas, Pennsylvania is the mother of
        Plaintiff MICHAEL HAINES.

111.    Plaintiff EDWARD KANE, JR. is a twenty-two-year-old male who resides in Swoyersville, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

112.    Plaintiff BRIANNA KEE is an eighteen-year-old female who resides in Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

113.    Plaintiff MATTHEW KOPETCHNY is a twenty-year-old male who resides in Kingston, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

114.    Plaintiff MAGEE MOTT is a twenty-three-year-old female who resides in Pittston, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

115.    Plaintiff G.M. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

116.    F.M. of Wilkes-Barre, Pennsylvania is the next friend and father of Plaintiff G.M.

117.    Plaintiff KRYSTAL POPE is a nineteen-year-old female who resides in Kingston, Pennsylvania.  She was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

118.    Plaintiff LISA SCARBROUGH of Mountain Top, Pennsylvania is a twenty-one-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

119.    Plaintiff LAURIE SCARBROUGH of Mountain Top, Pennsylvania is the mother of Plaintiff LISA SCARBROUGH.

120.    Plaintiff MARSHONDA SEWARD is a nineteen-year-old female from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

121.    Plaintiff J.S. is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

122.    Plaintiff C.S. of Plymouth, Pennsylvania is the next friend and mother of Plaintiff J.S.

123.    Plaintiff CHAD UCA is an eighteen-year-old male from Hazleton, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

124.    Plaintiff W.U. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

125.    Plaintiff D.S. of Wilkes-Barre, Pennsylvania is the next friend and mother
        of Plaintiff W.U.

126.    Plaintiff B.R.W. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male
        who was adjudicated delinquent and/or placed by Defendant
        CIAVARELLA some time between 2003 and 2008.

127.    Plaintiffs C.W. and S.W. of Wilkes-Barre, Pennsylvania are the next
        friends and parents of Plaintiff B.R.W.

**Defendants**

128.    Defendant MARK A. CIAVARELLA, JR. of Kingston, Pennsylvania
        ("Ciavarella") at all relevant times served as Judge of the Court of
        Common Pleas for Luzerne County, Pennsylvania.  He was Judge of the
        Juvenile Court for Luzerne County between approximately 1996 and
        May 23, 2008.  He was named President Judge for Luzerne County in
        January 2007.  He is sued in his individual capacity.  At all relevant times,
        he also controlled the business-entity defendant PINNACLE GROUP OF
        JUPITER, LLC.

129.    Defendant MICHAEL T. CONAHAN of Mountain Top, Pennsylvania
        ("Conahan") at all relevant times served as Judge of the Court of Common
        Pleas for Luzerne County, Pennsylvania. Between January 2002 and
        January 2007, he served as President Judge for Luzerne County.  He is

20

sued in his individual capacity.  At all relevant times, he also controlled the business-entity defendants BEVERAGE MARKETING OF PENNSYLVANIA, INC. and PINNACLE GROUP OF JUPITER, LLC.

130. Defendant ROBERT J. POWELL of Drums, Pennsylvania, at all relevant times, was an owner of defendants PA CHILD CARE, LLC; WESTERN PA CHILD CARE, LLC; MID-ATLANTIC YOUTH SERVICES; and VISION HOLDINGS, LLC.

131. Defendant ROBERT MERICLE of Wilkes-Barre, Pennsylvania at all relevant times was president of defendant MERICLE CONSTRUCTION, INC.

132. Defendant GREGORY ZAPPALA of Monroeville, Pennsylvania, at all relevant times, was an owner of defendants PA CHILD CARE, LLC; WESTERN PA CHILD CARE, LLC; and MID-ATLANTIC YOUTH SERVICES.

133. Defendant CINDY CIAVARELLA of Kingston, Pennsylvania ("Cindy Ciavarella") is the wife of MARK A. CIAVARELLA, JR., and owner at all relevant times of defendant PINNACLE GROUP OF JUPITER, LLC.

134. Defendant BARBARA CONAHAN of Mountain Top, Pennsylvania ("Barbara Conahan") is the wife of MICHAEL CONAHAN and managing

member, at all relevant times, of defendant PINNACLE GROUP OF

JUPITER, LLC.

135.     Defendant MERICLE CONSTRUCTION, INC. is located in Wilkes-Barre,

Pennsylvania.

136.     Defendant MID-ATLANTIC YOUTH SERVICES is located in Pittston

Township, Pennsylvania.

137.     Defendant PA CHILD CARE, LLC is located in Pittston Township,

Pennsylvania.

138.     Defendant WESTERN PA CHILD CARE, LLC is located in Emlenton,

Pennsylvania.

139.     Defendant PINNACLE GROUP OF JUPITER, LLC is a business entity

located in Mountain Top, Pennsylvania.

140.     Defendant VISION HOLDINGS, LLC is a Cayman Islands business entity

with a mailing address in West Hazleton, Pennsylvania.

141.     Defendant BEVERAGE MARKETING OF PENNSYLVANIA, INC. is a

business entity located in Selzer, Pennsylvania.

## CLASS ACTION ALLEGATIONS

142.     Plaintiffs bring this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3), on behalf of themselves and classes of

persons similarly situated.

143.    The classes are defined herein as follows:

    A.    All children who were adjudicated delinquent or referred to placement by Ciavarella between 2003 and May 2008, whose adjudications have been or will be expunged, vacated, or otherwise invalidated, as of the date of class certification.  Named plaintiffs H.T., B.W., Kevin Williamson, M.Y., R.S., and S.S. are class representatives.  This class is referred to hereinafter as Class A.

    B.    All children who were adjudicated delinquent or referred to placement by Ciavarella without counsel and without colloquies on the record that informed them of their rights and the consequences of waiving those rights, before either waiving counsel and/or pleading guilty, during the time period between 2003 and May 2008, and whose adjudications have been or will be expunged, vacated, or otherwise invalidated as of the date of class certification.  Named plaintiffs H.T., B.W., Kevin Williamson, M.Y., R.S., and S.S. are also class representatives of this class.  This class is referred to hereinafter as Class B.

    C.    All children adjudicated delinquent or referred to placement by Ciavarella, and their parents or guardians, who were assessed fees, costs, fines, restitution, or any other monetary charges associated

with the adjudication and/or placement during the time period between 2003 and May 2008. All named plaintiff youth and named plaintiff parents or guardians are class representatives. This class is referred to hereinafter as Class C.

144. The classes are sufficiently numerous such that joinder of all members is impracticable. Between 2003 and May 2008, Ciavarella adjudicated more than 2,500 children delinquent and placed more than 1000 of these children in facilities outside their homes. Other children were placed on probation or put under some other type of court supervision. As of the date of class certification, the vast majority of children adjudicated delinquent by Ciavarella between 2003 and May 2008 will have had their adjudications expunged, vacated, or otherwise invalidated pursuant to the procedure explained in paragraphs 565 and 566, below. None of the youth who appeared before Ciavarella without counsel and pled guilty had a colloquy regarding their waiver of counsel or guilty plea. The number of children who appeared before Ciavarella without counsel during the relevant time period is believed to be in excess of 1,200. Nearly all the children who were adjudicated delinquent by Ciavarella or placed by him between 2003 and May 2008, as well as their parents or guardians, were assessed fees, costs, fines, restitution, or other monetary charges.

24

145.   There are questions of law and fact common to the classes.  With respect to
Classes A and B, these questions include, among others, (1) whether
defendants did or conspired to violate plaintiffs' right to an impartial
tribunal guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the
U.S. Constitution; (2) whether defendants did or conspired to deprive
plaintiffs of their right to counsel, their right against self incrimination and
their right to have any guilty plea they make be knowing, intelligent, and
voluntary, in violation of the Fifth, Sixth, and Fourteenth Amendments of
the U.S. Constitution.  Additionally, with respect to Class C, these
questions include, among others, (1) whether defendants devised and/or
engaged a scheme or artifice to defraud the citizens of the Commonwealth
of Pennsylvania, including plaintiffs, and to deprive those citizens – and
particularly plaintiffs – of the intangible right of honest services and
engaged in other racketeering activity; (2) whether defendants, through that
racketeering activity, participated in the conduct of the affairs of an
association that functioned for the purpose of adjudicating youth and
providing housing for youth adjudicated delinquent; (3) whether
defendants, through that racketeering activity, acquired or maintained
interests in or control of the association; (4) whether defendants conspired
and agreed to acquire or maintain interests in or control of the association

and/or to participate in the conduct of the affairs of the association; and

(5) whether defendants' actions caused injury to plaintiffs' property

interests.

146.    The claims of the representative parties are typical of the claims of the

class.  Like the other members of the class, the named plaintiffs maintain

that defendants did or conspired to violate their rights to an impartial

tribunal, to counsel, and to a knowing, intelligent and voluntary guilty plea,

as well as caused them to suffer financial loss or other injuries to their

property interests through a pattern of racketeering activity.

147.    The representative plaintiffs will fairly and adequately represent and

protect the interests of the class members.  Plaintiffs have retained counsel

experienced in complex class action litigation, juvenile and constitutional

law, and the intersection thereof.  Juvenile Law Center has been at the

forefront of protecting and defending children's legal rights since 1975,

and has litigated many class action lawsuits involving children's

constitutional rights over the last 34 years.  Juvenile Law Center attorneys

have also authored or co-authored numerous scholarly articles addressing

children's legal rights in the juvenile justice system, and they teach courses

on the juvenile justice system at both the University of Pennsylvania Law

School and Temple University Beasley School of Law.  In 2008, Juvenile

Law Center was one of eight organizations world-wide to receive the MacArthur Foundation Award for Creative and Effective Institutions. Hangley Aronchick Segal & Pudlin's litigation department is highly regarded, with attorneys concentrating on a wide range of areas, including complex commercial litigation, constitutional litigation, and criminal defense and investigations.  The firm's attorneys have considerable expertise in both bringing and defending class action suits in federal and state courts.  The firm is proud of its long-standing relationship with one of the nation's premiere public interest law firms, the Juvenile Law Center.

148.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual members of the class, and because a class action is superior to other available methods of the fair and efficient adjudication of this litigation.  The class members are entitled to recovery as a result of the defendants' conspiracy to violate their constitutional rights and defendants' violation of federal RICO statutes. Individual differences in the cases of each class member do not defeat commonality, as plaintiffs seek recovery for the same violations of their constitutional rights and injury to their property interests without regard to each plaintiff's underlying circumstances.

27

## <u>OVERVIEW OF THE JUVENILE JUSTICE SYSTEM</u>

149.  The juvenile justice system in Pennsylvania and throughout the United

States was created based on the recognition that youth who commit

delinquent acts are fundamentally different than adult criminals.  Youth are

considered less culpable, more vulnerable, and more susceptible to

treatment and rehabilitation.  The juvenile justice system is therefore

designed to provide for the *care*, *supervision* and *rehabilitation* of youth

committing delinquent acts.  *See, e.g.*, *In re M.D.*, 839 A.2d 1116,

1120 (Pa. Super. Ct. 2003).

150.  The Juvenile Act in Pennsylvania states as its purpose, *inter alia*: "[t]o

provide for the care, protection, safety and wholesome mental and physical

development of children coming within the provisions of [the Act]."  42

Cons. Stat. § 6301(1).  The Act aims to achieve its purposes "in a family

environment whenever possible, separating the child from parents only

when necessary for his welfare, safety or health or in the interests of public

safety."  42 Pa. Cons. Stat. § 6301(3).  Courts in Pennsylvania have

recognized that, while principles and policies underlying the juvenile

justice system may have evolved since its creation, "particular importance

is still placed upon rehabilitating and protecting society's youth."  *In re*

*J.F.*, 714 A.2d 467, 471 (Pa. Super. Ct. 1998).

151.    Youth in delinquency proceedings are entitled to nearly all of the due
        process rights guaranteed to adult criminal defendants.  *See, e.g., McKeiver
        v. Pennsylvania*, 403 U.S. 528, 533 (1971) ("Among [the constitutional
        rights applicable in state juvenile proceedings] are the rights to appropriate
        notice, to counsel, to confrontation and to cross-examination, and the
        privilege against self-incrimination.  Included, also, is the standard of proof
        beyond a reasonable doubt.").

152.    The absolute right to counsel in juvenile adjudications has been firmly
        established for decades.  More than forty years ago, the United States
        Supreme Court held in *In re Gault*, 387 U.S. 1 (1967), that the Due Process
        Clause of the Fourteenth Amendment guarantees youth charged with
        delinquency and facing the possibility of incarceration the right to counsel.
        *Gault* recognized that a system in which children's liberty interests are not
        protected is a system that violates due process.  The Court recognized that
        attorneys are needed in the juvenile justice system to assist clients to "cope
        with problems of law, to make skilled inquiry into the facts, to insist upon
        regularity of the proceedings, and to ascertain whether [the client] . . . has a
        defense and to prepare and submit."  *Id.* at 36.

153.    Consistent with *Gault*, Pennsylvania's General Assembly and the
        Pennsylvania Supreme Court have established that the right to counsel

29

extends to juveniles through all stages of the juvenile delinquency process (*e.g.*, detention, pre-trial motions or hearings, adjudication, disposition, post-disposition, probation, appeal).  The General Assembly codified a juvenile's right to counsel in the Juvenile Act.  Section 6337 of the Act states that "a party is entitled to representation by legal counsel at all stages of any proceedings under [the Juvenile Act]." The judiciary's concern about delinquency hearings proceeding without counsel for the child led the Pennsylvania Supreme Court to require, effective October 1, 2005, that, where a waiver of counsel is proffered, that juvenile court must conduct an extensive colloquy with the juvenile to determine his or her comprehension of the consequences of a waiver.  Pa. R. Juv. Ct. P. 152.

154.   Today, the need for the assistance of counsel in juvenile court is even more paramount than it was when the Supreme Court issued the *Gault* decision in 1967.  Delinquency dispositions have become longer and more punitive, and delinquency adjudications now carry collateral consequences that follow youth into adulthood and, in some cases, for the rest of their lives. Of equal if not greater importance, as the stakes in juvenile court have risen, social science research has confirmed that most youth lack the capacity, on their own, to understand the nature of those stakes and to make intelligent decisions about how to navigate the increasingly complex

dimensions of the modern juvenile court. T. Grisso, L. Steinberg, *et al.*, *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adult Capacities as Trial Defendants*, Law and Human Behavior, Aug. 2003, at 333-63. Because of these complexities, as recognized in the Juvenile Act, children charged as delinquents should be provided with continuous legal representation throughout the delinquency process, including, but not limited to, detention, pre-trial motions or hearings, adjudication, disposition, post-disposition, probation, appeal, expungement, and sealing of records.

155. In 2001, Ciavarella himself publicly acknowledged the importance of the right to counsel in juvenile proceedings. After the Pennsylvania Superior Court overturned Ciavarella's adjudication of a youth denied his right to counsel, Ciavarella told the *Wilkes-Barre Times Leader*, "I'll never do it again . . . . They obviously have a right to a lawyer, and even if they come in and tell me they don't want a lawyer, they're going to have one."

156. During the next six years, Ciavarella, together with the other defendants, violated this promise, his judicial duties, and the constitutional rights of the youth plaintiffs in exchange for approximately $2.6 million.

31

# FACTUAL ALLEGATIONS[1]

### A.    PLAINTIFFS' ALLEGATIONS

<u>H.T., through and with her next friend and mother, L.T.</u>

157.    H.T., a seventeen-year-old female, and her mother L.T. reside in White
Haven, Pennsylvania.

158.    On April 17, 2007, H.T., then a fifteen year old, appeared before Ciavarella
for an adjudication hearing on a charge of harassment, a third degree
misdemeanor.  Specifically, H.T. was charged with creating a "My Space"
page (a website) about the assistant principal of her high school.  H.T. had
no prior contact with the juvenile justice system.

159.    H.T. did not have private counsel, nor was she appointed counsel.  At the
courthouse, prior to the adjudication hearing, H.T.'s mother signed a form,
given to her outside the courtroom and without explanation, waiving her
daughter's right to counsel.  H.T. did not sign the statement.

160.    At no point during the adjudication hearing did Ciavarella explain the
consequences of proceeding without counsel.  H.T. admitted creating the
website in question.  Ciavarella did not conduct a colloquy with H.T. on the

---

[1] All of the following allegations are based on information or belief, or based on the Bill of Information
filed by United States Attorney Martin C. Carlson against Mark A. Ciavarella, Jr. and Michael T.
Conahan on January 26, 2009 in the United States District Court for the Middle District of Pennsylvania
(No. 3:09-cr-028).

record to explain her rights and the consequences of waiving her right to a

trial.

161.    Although H.T. had no prior record and was adjudicated for a third degree

misdemeanor, the court immediately committed her to a residential

treatment facility operated by Youth Services Agency.  H.T. was lead away

in shackles and her shocked mother collapsed into tears.

162.    H.T. remained committed to the treatment facility for approximately one

month, when Juvenile Law Center filed a writ of habeas corpus challenging

the constitutionality of her adjudication and detention.  In May 2007, the

writ was granted by the juvenile court and H.T. was allowed to return home

to her family; her adjudication was vacated.

163.    H.T. was eventually placed on a consent decree by the court; she was

ordered to make payments – and is still making payments – to Juvenile

Probation.


B.W., through and with his next friend and father, W.W.

164.    B.W. is a sixteen-year-old male who resides with his father W.W. in

Mountain Top, Pennsylvania.

165.    In February 2007, at the age of fourteen, B.W. was charged with simple

assault for getting into a fight in school and with unauthorized use of a

motor vehicle for driving his parents' car without permission.

33

166.    When they arrived at the courthouse, B.W.'s father signed a form waiving

counsel.  B.W. was told by the court officer that he had to sign the waiver

form because his father did.

167.    B.W. appeared before Ciavarella without counsel; he was adjudicated

delinquent after he admitted to the charges.  Ciavarella did not inform B.W.

and his father that he had a right to an attorney and that the court would

appoint an attorney if they could not afford one.  Nor did Ciavarella explain

the potential consequences to B.W. of waiving his right to counsel and his

right to trial by pleading guilty.

168.    Ciavarella ordered B.W. into placement at Camp Adams where he

remained for about two months.  During the time he was at Camp Adams,

B.W. was repeatedly bullied by other juveniles.  When he returned home

he was placed on probation.

169.    In January 2008, B.W. was charged with possession of marijuana with

intent to deliver, simple possession, and unauthorized use of a vehicle.

Allegedly, B.W. was threatened by another child he met in Camp Adams to

deliver some marijuana.

170.    Before the hearing on these new charges, B.W.'s father again signed the

waiver of counsel form and B.W. was again told that he needed to sign the

form as well.

171.   B.W. appeared before Ciavarella without counsel; he was adjudicated delinquent after he admitted to the charges.  Ciavarella did not inform B.W. and his father that he had a right to an attorney and that the court would appoint an attorney if they could not afford one.  Nor did Ciavarella explain the potential consequences to B.W. of waiving his right to counsel or his right to trial by pleading guilty.

172.   Ciavarella sent B.W. back to Camp Adams, where he remained for about six weeks before being transferred to St. Michaels, where B.W. did very well and was nominated for an award for his outstanding performance.

173.   A volunteer attorney then stepped in and filed a writ of habeas corpus; B.W. was released from St. Michaels in the summer of 2008.

174.   The felony charge was *nul prossed*, but the adjudications for the misdemeanor charges of possession of a marijuana and unauthorized use of a motor vehicle remain on B.W.'s record.

175.    B.W. was ordered to and paid fees and costs to the court.  B.W.'s father was ordered to and paid $3,500 to the court to cover the costs of his placements in the various facilities.

Kevin Williamson and his mother, Susan Mishanski

176.   Kevin Williamson, now age eighteen, is the son of Susan Mishanski of Hanover Township, Pennsylvania.

177.    In April 2008, Kevin, then a seventeen year old, was charged with simple assault when he was in a fight with a friend outside of a concert hall.

178.    On April 22, 2008, Kevin was adjudicated delinquent in an approximately five-minute hearing before Ciavarella.

179.    Kevin was not told of his right to an attorney, but a public defender did appear in the middle of the hearing.  The public defender did not speak to Kevin.  Kevin believes that he may have pled guilty to the charges, but he does not think he was told the consequences of pleading guilty or of his right to a trial.

180.    Ciavarella ordered that Kevin be placed at Camp Adams for three months.

181.    In May 2007, the Juvenile Law Center filed a writ of habeas corpus on Kevin's behalf, challenging the constitutionality of Kevin's adjudication and detention.  On June 18, 2008, the court granted the writ; Kevin's delinquency adjudication was vacated and he was released from Camp Adams.

182.    Kevin was put on probation by Judge Lupas on the same charge in July 2008; this time, he was represented by an attorney whom his mother retained.  Kevin was successfully discharged from probation on February 5, 2009.

183.    Kevin's mother paid $450 to Juvenile Probation for the cost of placement.
        Kevin and his mother also were ordered to and paid $140 in court fees and
        $140 in Juvenile Probation fees.

M.Y., through and with her next friends and parents, M.B.Y and J.Y.

184.    M.Y. is a seventeen-year-old female who resides with her parents, M.B.Y.
        and J.Y., in Sugarloaf, Pennsylvania.

185.    In April 2008, at the age of sixteen, school security found less than five
        dollars worth of marijuana in the glove compartment of her father's car,
        which she had driven to school that day.  She was arrested.

186.    Shortly thereafter, the family received a notice that M.Y. was to report to
        court for a hearing on the possession charge.  M.Y.'s parents considered
        hiring an attorney but believed the court would be fair since M.Y. was an
        honor student and this was her first offense.

187.    M.Y., without counsel, appeared before Ciavarella and admitted to the
        charge.  Ciavarella adjudicated M.Y. delinquent and ordered that she be
        placed at Camp Adams for ninety days.

188.    M.Y.'s stunned parents immediately sought help for their daughter.  A pro
        bono attorney filed a writ of habeas corpus challenging the constitutionality
        of her adjudication and detention.  In response to the writ, the Luzerne

County Juvenile Court released M.Y. to her parents and vacated the

adjudication.

P.S., through and with his next friend and mother, A.S.

189.    P.S., now fifteen years old, is the son of A.S. of Wilkes-Barre,

Pennsylvania.  In 2007, when he was fourteen years old, P.S. was arrested

for stealing loose change from unlocked cars.

190.    One of the police officers who arrested P.S. told A.S. that P.S. would

receive probation because P.S. cooperated with the police and committed a

minor offense.

191.    Before P.S.'s hearing, A.S. contacted two attorneys about representing P.S.

The first attorney advised her against hiring him because A.S. would likely

receive probation even without the assistance of an attorney.  The second

attorney asked her for the name of the judge assigned to the case.  When

she told the attorney it was Ciavarella, the attorney advised her that it

would be "a waste of money" to hire him because Ciavarella does not listen

to the attorneys of juvenile defendants.

192.    Before entering Ciavarella's courtroom, A.S. was asked to sign a form

waiving P.S.'s right to an attorney.  A.S. told the staff person that she

would like P.S. to be represented by an attorney, but that she could not

afford to hire one.  The staff person pressured A.S. into signing the form by

38

telling her that it would take six to eight months to assign a public defender to P.S. and that P.S. would be held in detention in the interim.

193.   P.S. appeared before Ciavarella without counsel; he was adjudicated delinquent.  Ciavarella did not inform P.S. or A.S. that P.S. had a right to an attorney and that the court would appoint an attorney if P.S. could not afford one.  Nor did Ciavarella explain the potential consequences to P.S. of waiving his right to an attorney.

194.   P.S.'s hearing before Ciavarella lasted no longer than three minutes. Ciavarella asked P.S. whether he would plead guilty, but did not explain the legal rights P.S. would relinquish by waiving his right to a trial.  P.S. pled guilty.

195.   P.S. was detained at Camp Adams for three days before he was transferred to Glen Mills.

196.   P.S. remained at Glen Mills for approximately twelve months, when pro bono attorneys who had become aware of his situation filed a writ of habeas corpus challenging the constitutionality of his underlying adjudication and commitment.

197.   The Luzerne County Juvenile Court granted the writ in June 2008, his adjudication was vacated, and P.S. returned home.  P.S. is currently on probation.

198. P.S.'s father pays $440 per month in child support for P.S.  The Domestic Relations Court redirected the child support payments to Juvenile Probation while P.S. was in placement.

199. The court also ordered P.S. to pay $1,900 in restitution fines.  Juvenile Probation also told A.S. that she will have to pay between $45 and $80 per month for every month P.S. is on probation.  Juvenile Probation told A.S. that P.S.'s probation will not end until P.S. and A.S. pay the restitution, fines, and probation fees.

200. Although P.S. was fourteen when he was detained at Glen Mills, Glen Mills placed him in pre-GED classes.  He was not assigned a grade level. When he returned home from Glen Mills, he was therefore held back a grade.

201. At Glen Mills, P.S. developed anxiety and depression.  As a result, he can no longer attend school.  He now receives homebound instruction.

S.S., through and with his next friend and mother, R.K.

202. S.S. is seventeen years old.  He resides with his mother, R.K., of Wilkes-Barre, Pennsylvania.

203. In October 2007, when S.S. was sixteen years old, S.S. was charged with driving without a license and presenting false identification to the police in Dauphin County.

204.    That month, S.S. appeared, with an attorney, before the Dauphin County

        Juvenile Court and made a counseled admission to the charges.  The

        Dauphin County court then transferred the case to the Luzerne County

        Juvenile Court as S.S. was (and still is) a resident of Luzerne County.

205.    On November 14, 2007, S.S. appeared without counsel before Ciavarella

        for an adjudication/disposition hearing.  Ciavarella did not ascertain

        whether S.S. knew he had the right to counsel, nor did the court obtain an

        affirmative waiver of counsel from S.S. on the record.

206.    Ciavarella ordered that S.S. be placed a Glen Mills School for an indefinite

        period.  Upon Ciavarella's order, S.S. spent approximately two weeks from

        November 14 to November 28, 2007 in PA Child Care and then was

        transferred to Glen Mills.

207.    S.S. remained at Glen Mills until July 2008, when Juvenile Law Center

        filed a writ of habeas corpus, challenging the constitutionality of his

        adjudication and detention.  On July 31, 2008, Judge Lupas of the Luzerne

        County Juvenile Court issued an order releasing S.S. from his commitment

        at Glen Mills and vacating the delinquency adjudication and disposition of

        November 14, 2007.

208.    During S.S.'s placement at Glen Mills, the court garnished S.S.'s

        survivor's check of $598 a month, which S.S. has received from Social

41

Security since his father passed away.  S.S. was also ordered to pay fees and costs of $35 a month to the court.

Jessica Van Reeth and her father, Jack Van Reeth

209.   Jessica Van Reeth, now nineteen years old, lives with her mother, Toni, and her father, Jack Van Reeth, in Mountain Top, Pennsylvania.  On January 30, 2007, Jessica, then sixteen, appeared before Ciavarella for an adjudication hearing on a delinquency petition charging her with possession of drug paraphernalia, namely a cigarette lighter and pipe, which is a misdemeanor.  Jessica had no prior contact with law enforcement.

210.   Prior to the hearing, Jessica and her father were interviewed by a Luzerne County Juvenile Probation Officer, who told them that he would not recommend placement to the court.

211.   Jessica appeared in court without a lawyer.  Jessica was not advised of her right to counsel, nor did Ciavarella administer a colloquy with Jessica on the record to explain the consequences of proceeding without counsel. During the hearing, Jessica admitted to the charge and she was adjudicated delinquent.  Ciavarella did not conduct a colloquy with Jessica on the record to explain her rights and the consequences of waiving her right to a trial.

42

212.   Despite the fact that she had no prior record, Ciavarella ordered Jessica placed in Camp Adams for three months.  She was immediately handcuffed and escorted out of the courtroom without even getting a chance to say good-bye to her father.  She was not allowed to see her parents for the first two weeks she was in placement.

213.   Jessica was released from Camp Adams on April 26, 2007 and placed on intensive probation for an additional three months.  The Juvenile Court's supervision over Jessica ended on September 17, 2007.

214.   Jessica and her parents were ordered to and paid monies to Juvenile Probation to cover various fees and costs associated with her adjudication and placement.

<u>M.K., through and with his next friend and father, J.F.K.</u>

215.   M.K. is the seventeen year old son of J.F.K. of Exeter, Pennsylvania.

216.   In December 2004, when he was thirteen years old, M.K. was charged with simple assault and harassment.  The charges arose out of an incident in November, in which his mother's boyfriend alleged that M.K. spilled beer on the floor, pushed him around, and threw a piece of steak on him.  The boyfriend was 6'3" tall and weighed about 210 pounds, while M.K. was 4'2" tall and weighed 87 pounds.  At the time, M.K.'s parents were involved in a custody dispute.

217.    On December 28, 2004, M.K. appeared with his father and a lawyer before Ciavarella.  M.K., who had no prior police record, told the judge he had done nothing wrong.  Ciavarella ordered that M.K. be placed in PA Child Care pending a psychological evaluation.  M.K. was taken out of the courtroom in handcuffs and shackles.

218.    On January 13, 2005, sixteen days after being locked up in PA Child Care, M.K. was evaluated by Dr. Frank Vita.  M.K. remained in placement for an additional thirty-two days after the evaluation.  He remained at PA Child Care the entire time, except for one week when he was transferred to Tioga County Detention Center due to space constraints.

219.    On January 27, 2005, M.K.'s father attended a meeting at PA Child Care. At that meeting, Sandra M. Brulo, then chief of Juvenile Probation, told M.K.'s father that she could send M.K. away until he was twenty-one years old.  Indeed, in a report to the court dated January 28, 2005, Ms. Brulo recommended to the court that M.K. be placed for one year at the Colorado Boys Ranch, followed by a second year at Glen Mills School in Pennsylvania.

220.    Frustrated that his son was being held and concerned that he would be sent out of state, M.K.'s father approached the local media.  They published a story describing M.K.'s plight on February 9, 2005.

221.    On February 14, 2005, five days after the article appeared in the *Wilkes-Barre Times-Leader*, M.K. again appeared in court.  Ciavarella ordered that M.K. be released from PA Child Care and placed on probation for approximately six months.

222.    M.K. and his father were ordered to pay $420 in probation and detention service fees to the Juvenile Probation department.  In addition, M.K.'s father paid for the services of an attorney to represent his son.

Charles Balasavage Jr. and his parents, Charles and Joanne Balasavage

223.    Charles Balasavage Jr., now eighteen years old, is the son of Charles and Joanne Balasavage of Wilkes-Barre, Pennsylvania.

224.    In 2006, when he was sixteen years old, Charles was adjudicated delinquent by Ciavarella for receiving a stolen scooter.  Charles did not go to trial but neither he nor his father can remember if he actually pled guilty in the three-minute hearing.  Charles was unrepresented.  Ciavarella did not inform Charles that he had a right to an attorney, or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Charles of waiving his right to counsel and of waiving his right to trial by pleading guilty.

225.    Although Charles had no prior record and was adjudicated delinquent on a misdemeanor charge, Ciavarella placed him in PA Child Care, where he

initially remained for approximately four to six weeks.  Then he was placed
at two other facilities before being sent home and placed on probation.

226.    Over the next two years, Ciavarella ordered that Charles be placed in PA
Child Care on at least four other occasions, in Western PA Child Care on
one occasion, and in various other facilities.

227.    Charles was ordered to and paid fees and costs to the court.  His parents
were ordered to and paid money to Juvenile Probation to cover the costs of
his placements in PA Child Care, Western PA Child Care, and various
other facilities, and for Charles to receive a psychological examination.

Jesse Balliet and his mother, Florence Myers

228.    Jesse Balliet, now age twenty-two, is the son of Florence Myers of Wilkes-
Barre, Pennsylvania.

229.    In 2003, when he was fifteen years old, Jesse was adjudicated delinquent
for simple assault.  Jesse was not represented by counsel.  Ciavarella did
not inform Jesse that he had a right to an attorney or that the court would
appoint an attorney if he could not afford one.  Nor did Ciavarella explain
the potential consequences to Jesse of waiving his right to counsel and of
waiving his right to trial by pleading guilty.

230.    Even though this was Jesse's first offense, Ciavarella ordered that Jesse be
placed at Camp Adams for three months.

231.   Jesse and his father were ordered to and paid about $2,000 to Juvenile

Probation in various fees and costs including for the cost of Jesse's

placement.

Steven Brannigan

232.   Steven Brannigan, now eighteen years old, is the son of Lisa Brannigan of

Hanover Township, Pennsylvania.

233.   Since 2003, Steven has been before Ciavarella on four separate charges of

delinquency.  Each time Steven appeared before Ciavarella, he was placed.

234.   In 2003, he was placed in Camp Adams for four months.

235.   In January 2005, he appeared before Ciavarella without counsel.

Ciavarella immediately sent Steven to PA Child Care for a month without

receiving testimony from anyone.  He was later placed in various other

facilities.

236.   In 2007, on charges of hindering, Steven appeared before Ciavarella,

represented by a public defender.  The public defender advised Steven that

he would likely get a maximum sentence if he did not plead guilty, so

Steven pled guilty.  Ciavarella did not explain the consequences of a plea,

nor did he explain Steven's right to a trial.  Ciavarella accepted his plea,

however, and sent Steven to Camp Adams for a month and then to Job

Corps for a year.  Steven is currently on probation.

237. Each time Steven was in placement, his mother was required to pay child support to Juvenile Probation. Both Steven and his mother are currently making payments to Juvenile Probation to cover the costs of supervision. Steven's mother pays $25 per month and Steven pays $40 per month.

238. Following his placement, Steven dropped out of high school. However, while in Job Corps, he was able to get his GED.

Jeffrey Bruno

239. Jeffrey Bruno, now twenty-one years old, is the son of Jay and Karen Bruno of Larksville, Pennsylvania.

240. In 2003, when he was sixteen years old, Jeffrey was adjudicated delinquent by Ciavarella on a charge of driving a dirt bike while intoxicated. Jeffrey was not represented by counsel, and he apparently pled guilty by nodding his head after the judge read the charges. Ciavarella did not inform Jeffrey that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Jeffrey of waiving his right to counsel and of waiving his right to trial by pleading guilty.

241. By Ciavarella's order, Jeffrey was placed in PA Child Care for about two and one-half months. He was then placed at another facility for six months.

48

242.    Jeffrey and his parents were ordered to pay various fees and costs to
        Juvenile Probation.  Specifically, his parents paid about $4,500 for
        placement costs.  Funds were deducted from Jeffrey's father's disability
        check and garnished from his mother's wages.  Jeffrey and his parents also
        paid $225 for probation fees and $1,200 in court costs.

Scott Bukoski

243.    Scott Bukoski is a twenty-one-year-old male from Nanticoke,
        Pennsylvania.  His father is Brian Bukoski.

244.    In May 2005, Scott was adjudicated delinquent by Ciavarella on a charge
        of unlawful use of a vehicle.  After Ciavarella read out loud the charges,
        Scott pled not guilty.  However, without a trial, Ciavarella adjudicated
        Scott delinquent.  Scott was not represented by counsel.  Ciavarella did not
        inform Scott that he had a right to an attorney or that the court would
        appoint an attorney if he could not afford one.  Nor did Ciavarella explain
        the potential consequences to Scott of waiving his right to counsel and of
        waiving his right to trial by pleading guilty.

245.    Upon Ciavarella's order, Scott was placed at Camp Adams for ninety days.

246.    Scott and his father were ordered to and paid various fees and costs to
        Juvenile Probation.

<u>D.C., through and with his next friend and mother, R.C.</u>

247.   D.C., now seventeen years old, is the son of R.C. of Shickshinny,

Pennsylvania.

248.   In 2007, when D.C. was sixteen years old, he was adjudicated delinquent

by Ciavarella on possession of drug paraphernalia and burglary charges.

D.C., who was unrepresented by counsel, pled guilty.  Ciavarella did not

inform D.C. that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to D.C. of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

249.   Ciavarella ordered D.C. to be sent to Camp Adams for a few weeks.  From

there he was sent to PA Child Care for a few days and then to another

facility for twelve months.

250.   D.C. and his parents were ordered to and paid various fees and costs to the

court.  Specifically, the court garnished the wages of both D.C.'s father and

mother at a rate of roughly $20 per day; a total of $7,300 was garnished.

The court also took their adoption subsidy in the amount of $600 per

month.  While D.C. was on probation, his parents were ordered to pay to

Juvenile Probation $35 per month and to pay separately for the ankle

monitor, which was $100.  D.C. also was ordered to pay $1,700 in restitution.

Ruth Davis and her mother, Carol Fronczek

251.    Ruth Davis, now twenty-two years old, is the daughter of Carol Fronczek of Shavertown, Pennsylvania.

252.    At age seventeen, Ruth was adjudicated delinquent by Ciavarella on a simple assault charge.  Ruth, who was unrepresented by counsel, pled guilty.  Ciavarella did not inform Ruth that she had a right to an attorney or that the court would appoint an attorney if she could not afford one.  Nor did Ciavarella explain the potential consequences to Ruth of waiving her right to counsel and of waiving her right to trial by pleading guilty.

253.    Upon Ciavarella's orders, Ruth was in various placements between 2003 and 2005, including in PA Child Care for approximately seven months.

254.    Ruth's mother was ordered to and paid child support to Juvenile Probation for the duration of Ruth's placement.  Ruth and her mother also were ordered to and paid court fees.

William Dixon

255.    William Dixon is the twenty-one-year-old son of Janet Dixon of Plymouth, Pennsylvania.

256.    In April 2003, when he was fifteen, William was adjudicated delinquent by

Ciavarella on misdemeanor charges arising out of an incident involving his

family.  Prior to appearing before Ciavarella, William was held in PA Child

Care for five days without a hearing.

257.    When William finally appeared before Ciavarella, he was unrepresented by

counsel.  Ciavarella asked William if had disrespected his grandfather, to

which William answered yes.  William was adjudicated delinquent even

though he did not actually plead guilty or admit to the charges.  Ciavarella

did not inform William that he had a right to an attorney or that the court

would appoint an attorney if he could not afford one.  Nor did Ciavarella

explain the potential consequences to William of waiving his right to

counsel and of waiving his right to trial by pleading guilty.

258.    Upon Ciavarella's order, William was placed at Camp Adams for sixty

days; he was placed on probation after he returned home.

259.    William's mother's paycheck was attached to cover the costs of his

placement.  William was ordered to and paid Juvenile Probation $35 per

month from the period July 2003 through May 2004.  In total, William and

his family paid about $2,300.

J.G., through and with his next friend and mother, M.O.

260.    J.G., now seventeen, is the son of M.O. of Harvey's Lake, Pennsylvania.

261.   In 2007, when he was fifteen, J.G. was adjudicated delinquent by

Ciavarella.  J.G. was unrepresented by counsel.  According to J.G.'s

mother, J.G. may have pled guilty, but she is not sure because the hearing

lasted about five seconds.  Ciavarella did not inform J.G. that he had a right

to an attorney or that the court would appoint an attorney if he could not

afford one.  Nor did Ciavarella explain the potential consequences to J.G.

of waiving his right to counsel and of waiving his right to trial by pleading

guilty.

262.   Upon Ciavarella's orders, J.G. was sent to Camp Adams for three months.

263.   J.G.'s mother was ordered to and paid about $2,000 to Juvenile Probation

for the cost of placement, a portion of which was deducted directly from

her tax refund.  J.G. and her mother were ordered to and paid about $200 in

fees and costs to Juvenile Probation.

Brian Gyle

264.   Brian Gyle, now nineteen, is the son of Maria Gyle of Pittston,

Pennsylvania.

265.   Brian was adjudicated delinquent by Ciavarella on four occasions from

2003 to 2004.  Upon Ciavarella's orders, Brian was placed at different

times in PA Child Care, Camp Adams, and Northwestern Academy.

266.    Brian and his parents were ordered to pay to Juvenile Probation $1,728.68
        for fines, probation and detention fees, and services.

Wayne Gyle

267.    Wayne Gyle, now age twenty-one, is the son of Maria Gyle of Pittston,
        Pennsylvania.

268.    On July 21, 2004, Wayne was charged with simple assault, terroristic
        threats, and harassment.  He was placed in PA Child Care for sixteen days
        prior to seeing a judge.

269.    On August 6, 2004, Wayne appeared before Ciavarella.  Although the
        charges against him were dismissed, Ciavarella ordered that Wayne's
        probation resulting from an earlier adjudication be extended for one year.
        Neither Wayne nor his mother recall that Wayne was represented by an
        attorney or told of Wayne's right to counsel at this hearing.

270.    Wayne was ordered to pay Juvenile Probation fees and still owes
        approximately $5,000.

Tracy Harvey

271.    Tracy Harvey, now eighteen years old, is the son of Albert Harvey of
        Harvey's Lake, Pennsylvania.

272.   In 2007, when Tracy was sixteen years old, he was adjudicated delinquent by Ciavarella on a charge of being under the influence of a substance. Tracy, who was unrepresented, did not formally plead guilty, nor did Ciavarella seek a plea.  Ciavarella merely asked the police officer what happened, and he did not allow anyone else in the courtroom to speak. Ciavarella did not inform Tracy that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Tracy of waiving his right to counsel and of waiving his right to trial by pleading guilty.

273.   Tracy was placed in PA Child Care for one week and then transferred to another facility for seven months.

274.   Tracy's father was ordered by a letter he received from Juvenile Probation to pay $200 per month to the Pennsylvania State Collection Disbursement Unit ("PA SCDU") to cover the cost of Tracy's placement.  When he was unable to continue paying that amount, his wages were garnished.  Since Tracy's release from placement in July 2008, he has been paying supervision fees for his probation; he was ordered to pay $350 plus $35 per month to Juvenile Probation for supervision.

<u>D.J., through and with his next friend and mother, S.J.</u>

275.    D.J., now sixteen years old, is the son of S.J. of Edwardsville,

Pennsylvania.

276.    In 2005, when D.J. was about thirteen years old, the police picked him up

from school on a Friday morning and told him he was being taken to

detention because he had failed to appear as a witness to a school fight.

D.J.'s mother reports that she never received a subpoena for her minor son

to appear as a witness.

277.    D.J. was taken from school to PA Child Care.  Police would not let D.J.'s

mother speak to or see her son, and the police did not fully explain what

was going on.

278.    D.J. was brought to court on the following Monday, having spent the

weekend at PA Child Care.  In court, Ciavarella yelled at D.J. and his

attorney.  D.J. was then released without ever testifying.

279.    D.J. has never been arrested or detained aside from this incident.

280.    D.J.'s mother paid $500 to the attorney to appear with her son in court.

<u>Barbara Kearns and her mother, Barbara Thurston</u>

281.    Barbara Kearns, now nineteen years old, is the daughter of Barbara

Thurston of Wilkes-Barre, Pennsylvania.

56

282. In September 2003, when Barbara was fourteen years old, she appeared

before Ciavarella on a curfew violation; at the time, she was on probation

for a previous adjudication on a retail theft charge. Barbara was

unrepresented by counsel. In the very short hearing, Ciavarella did not

hear any evidence. Barbara pled not guilty. Ciavarella did not inform

Barbara that she had a right to an attorney or that the court would appoint

an attorney if she could not afford one. Nor did Ciavarella explain the

potential consequences to Barbara of waiving her right to counsel and of

waiving her right to trial by pleading guilty.

283. Barbara was then placed in PA Child Care for three days, at Camp Adams

for over six months, and at another boot camp for a week. In 2006, after

appearing before Ciavarella again without counsel, Barbara received

probation.

284. Barbara was ordered to pay fees and costs to the court. Her Supplemental

Security Income check was garnished to offset the cost of placement.

Kurt Kruger

285. Kurt Kruger is a twenty-two-year-old male who resides in Wilkes-Barre,

Pennsylvania.

286. In 2004, when he was seventeen years old, Kurt was adjudicated delinquent

by Ciavarella on a charge of conspiracy to shoplift. Before appearing in

court, Kurt was held in PA Child Care for three days.  Kurt did not have

counsel at his hearing, at which he made an admission.  Ciavarella did not

inform Kurt that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to Kurt of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

287. Despite the fact that shoplifting is a summary offense, Ciavarella ordered

that Kurt be placed at Camp Adams, where he remained for four months.

288. Kurt's parents were ordered and paid to Juvenile Probation $1,000 to

$2,000 for the cost of his placements.  Kurt himself was ordered to and

paid approximately $200 in restitution.

J.M.K., through and with his next friend and mother, B.T.

289. J.M.K., now seventeen years old, is the son of B.T. of Wilkes-Barre,

Pennsylvania.

290. J.M.K. was charged in 2002 with fighting in school and then again for a

curfew violation.  When he was fourteen years old, in 2005, J.M.K. was

again charged with fighting.

291. In most circumstances when J.M.K. appeared before Ciavarella, he was

without counsel.  In the very short hearings, J.M.K. attempted to explain

the circumstances surrounding the charge, and Ciavarella did not allow him

to speak.  At all but one of these hearings, Ciavarella did not inform J.M.K. that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to J.M.K. of waiving his right to counsel and of waiving his right to trial by pleading guilty.

292.   Between 2002 and 2005, J.M.K. was placed by Ciavarella in various facilities including PA Child Care and Western PA Child Care.

293.   J.M.K.'s mother was ordered to pay fees and costs associated with J.M.K.'s placement and supervision.  Because of her financial hardship, J.M.K.'s mother was unable to pay more than a couple hundred dollars during the last seven years.  Because J.M.K. received Supplemental Security Income, those checks were automatically garnished to cover the costs of his placement and supervision.  J.M.K. and his mother still owe money to Juvenile Probation.

Edward Kenzakoski III

294.   Edward Kenzakoski III is a twenty-two-year-old male from Wilkes-Barre, Pennsylvania.  He is the son of Sandy Fonzo and Edward Kenzakoski, Jr.

295.   In September 2003, Edward, then seventeen years old, was adjudicated delinquent by Ciavarella on a misdemeanor charge of possession of drug paraphernalia.  Before the filing of the delinquency petition, Edward had

no prior contact with law enforcement.  Edward appeared before Ciavarella without counsel.  Edward was not advised of his right to counsel and to have counsel appointed for him, nor did Ciavarella conduct a colloquy with Edward on the record to explain the consequences of proceeding without counsel.  Edward admitted to the charge, but Ciavarella did not conduct a colloquy with Edward on the record to explain the consequences of pleading guilty and giving up his right to a trial.

296.    After adjudicating him delinquent, Ciavarella immediately committed Edward to PA Child Care for more than thirty days.

297.    In October 2003, Edward, then in the custody of PA Child Care, appeared before Ciavarella, again without counsel, and was then ordered into placement at a boot camp for 120 days.  Edward was released four months later and was placed on probation for several months.

298.    One week before his probation would have expired, Edward failed to appear at a scheduled delinquency review hearing, and the Juvenile Court issued a bench warrant.  In the fall of 2005, Edward, then nineteen years old, was involved in a traffic accident.  He was taken into custody based on the bench warrant and appeared, without counsel, before Ciavarella for a violation of probation hearing.  Edward was immediately committed to Western PA Child Care for 120 days.

299.   Upon his release in the winter of 2006, Juvenile Court jurisdiction ended.

300.   Edward was ordered to and paid fees and costs to the court.  His parents
       were ordered to and paid approximately $5,000 to the court to cover the
       costs of his placements.

## J.K., through and with his next friend and father, A.K.

301.   J.K. is the fifteen-year-old son of A.K. and D.K. of Kingston,
       Pennsylvania.

302.   In July 2007, when he was thirteen years old, J.K. was adjudicated
       delinquent on charges of criminal mischief, trespass, and attempted
       burglary after having been found one night playing a game called Manhunt
       on the grounds of a local school.  Prior to going to court, J.K.'s parents
       applied for a public defender to represent J.K., but they were told that they
       made too much money to qualify.

303.   J.K. appeared before Ciavarella without counsel.  His parents asked for a
       continuance to obtain a lawyer, but that request was denied.

304.   After he was adjudicated delinquent, J.K. was sent by the court to PA Child
       Care and then Camp Adams for about five days.  When he returned home,
       he was placed on house arrest.  When he broke his house arrest rules, J.K.
       was sent to another residential facility where he remained for
       approximately nine months, until September 2007.

305.   J.K.'s parents were ordered to and paid $3,300 to PA SCDU for his

placement; a portion of the monies were garnished from unemployment

checks.  J.K. himself was ordered to and is still paying fees and costs to the

court.

B.L., through and with his next friend and father M.L.

306.   B.L., now sixteen years old, is the son of M.L. of Kingston, Pennsylvania.

307.   In 2006, when he was thirteen years old, B.L. was adjudicated delinquent

by Ciavarella on a charge of perjury.  B.L. was unrepresented when he

appeared before Ciavarella.  Ciavarella did not inform B.L. that he had a

right to an attorney or that the court would appoint an attorney if he could

not afford one.  Nor did Ciavarella explain the potential consequences to

B.L. of waiving his right to counsel.  B.L. pled not guilty.  Ciavarella told

B.L. that he was guilty.

308.   Although he had no prior contact with the juvenile justice system,

Ciavarella ordered that B.L. be placed in Camp Adams for ninety-three

days.

309.   M.L. had $150 a week taken from his paycheck during the three months

that B.L. was placed.  B.L. has received multiple notices indicating that he

owes $500 to Juvenile Probation.

Anthony Millan and his mother, Cindy Millan

310.    Anthony Millan, now twenty years old, is the son of Cindy Millan of

        Nanticoke, Pennsylvania.

311.    In 2005, when Anthony was sixteen years old, Anthony was adjudicated

        delinquent for fighting in school.  This was Anthony's first offense.  When

        he appeared before Ciavarella, Anthony was unrepresented by counsel.

        Ciavarella did not inform Anthony that he had a right to an attorney or that

        the court would appoint an attorney if he could not afford one.  Nor did

        Ciavarella explain the potential consequences to Anthony of waiving his

        right to counsel.  Anthony pled not guilty.

312.    Ciavarella immediately ordered Anthony shackled and sent him to Camp

        Adams where he remained for three months.

313.    Anthony's mother was ordered to pay placement fees, court costs, and

        supervision costs totaling over $200.

Damon Millan and his mother, Cindy Millan

314.    Damon Millan, now eighteen years old, is the son of Cindy Millan of

        Nanticoke, Pennsylvania.

315.    In 2007, when Damon was sixteen years old, he was adjudicated delinquent

        by Ciavarella on a breaking and entering charge.  When Damon appeared

        before Ciavarella, he was represented by a private attorney.  Damon pled

not guilty.  However, neither Damon's attorney nor anyone else was permitted to speak.  The homeowners who were burglarized were in the courtroom and wanted to explain that they did not believe Damon was involved, but Ciavarella did not allow them to speak.

316.   Ciavarella ordered Damon to Camp Adams, where he remained for three months.

317.   Damon's mother recalls that she and Damon were ordered to and paid to Juvenile Probation roughly $200 for the cost of supervision, placement, and court fees.

Paul Morgan Jr.

318.   Paul Morgan Jr., now eighteen years old, is the son of Tracy Stair and Paul Morgan of Mountain Top, Pennsylvania.

319.   In 2005, Paul was adjudicated delinquent by Ciavarella for possession of a controlled substance.  Paul, unrepresented by counsel, pled guilty. Ciavarella did not inform Paul that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Paul of waiving his right to counsel and of waiving his right to trial by pleading guilty.

320.   Paul was placed in PA Child Care for three days.  After he was released, he was put on probation for six months.

64

321.    Tracy paid Juvenile Probation $35 per month during this six-month period to cover the cost of Paul's probation.

322.    In 2007, Paul was again adjudicated delinquent by Ciavarella on charges of harassment and disorderly conduct.  Again, Paul was unrepresented by counsel and pled guilty.  Ciavarella did not inform Paul that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Paul of waiving his right to counsel and of waiving his right to trial by pleading guilty.

323.    Ciavarella placed Paul at Camp Adams for three months and placed him on probation for six months following his release.

324.    At the time of these events, Paul's father had been paying to Tracy $46 per week in child support.  These payments were redirected to Juvenile Probation during the three months Paul was detained at Camp Adams. Tracy and Paul paid Juvenile Probation $35 per month while he was on probation.

Steven Palchanis Jr., and his father, Steven Palchanis Sr.

325.    Steven Palchanis Jr., now twenty-one years old, is the son of Steven Palchanis Sr. of Wilkes-Barre, Pennsylvania.

326.   In 2003, when Steven was sixteen years old, he was adjudicated delinquent

by Ciavarella for criminal trespass.  Unrepresented by counsel, Steven pled

guilty.  Ciavarella did not inform Steven that he had a right to an attorney

or that the court would appoint an attorney if he could not afford one.  Nor

did Ciavarella explain the potential consequences to Steven of waiving his

right to counsel and of waiving his right to trial by pleading guilty.

327.   Upon Ciavarella's order, Steven was shackled and taken to PA Child Care,

where he remained for three weeks before going to Camp Adams for ninety

days.  Following his release from placement, Steven was placed on

probation for almost five years, until he paid off approximately $3,000 in

restitution.

328.   Steven and his parents were ordered to and paid monies to the court for his

placement; the money was garnished from the paycheck of Steven's father.

Furthermore, they were required to pay various fees to Juvenile Probation

while Steven was on probation.  In total, they paid about $7,000.

Jamie Quinn

329.   Jamie Quinn is an eighteen-year-old female who resides in Wyoming,

Pennsylvania.

330.   In 2005, when she was fourteen years old, Jamie was charged with simple

assault and harassment after punching another girl.

331.    During her hearing, Jamie was not represented by an attorney, as the intake

worker had told her she did not need one because the charges were minor.

Ciavarella never informed Jamie of her right to an attorney or the

consequences of waiving that right.  Furthermore, Ciavarella never

explained to Jamie her trial rights or what, specifically, she was charged

with.

332.    Jamie was initially told she would be placed in a detention center for three

to six months, but she ended up staying in various facilities (PA Child

Care, Vision Quest, and Bridgeview) for nearly a year.

333.    Jamie's parents were ordered to and paid fees and costs to the court, as well

as costs to Juvenile Probation for Jamie's placement.

334.    Jamie's detention had lasting and negative consequences to her, most

distinctly illustrated by the many scars she bears from self-mutilation

during her detention.

K.R., through and with his next friend and mother, T.S.

335.    K.R, now seventeen years old, is the son of T.S. of Hanover Township,

Pennsylvania.

336.    In 2007, when K.R. was sixteen years old, he was adjudicated delinquent

by Ciavarella for disorderly conduct after getting into a fight on a school

bus.  Unrepresented by counsel, K.R. pled guilty.  Ciavarella did not

inform K.R. that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to K.R. of waiving his right to counsel and of waiving his right to trial by pleading guilty.

337.   Ciavarella placed K.R. at Camp Adams from April to July 2007, and K.R. is still on probation.

338.   K.R. was ordered to pay $30 per month to Juvenile Probation for every month he is on probation.

<u>David Rowlands and his mother, Mary Seville</u>

339.   David Rowlands, now eighteen years old, is the son of Mary Seville of Laporte, Pennsylvania.

340.   In October 2003, when David was twelve years old, he was adjudicated delinquent by Ciavarella for harassment.  Unrepresented by counsel, David pled guilty.  Ciavarella did not inform David that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to David of waiving his right to counsel and of waiving his right to trial by pleading guilty.

341.   Ciavarella ordered David placed in PA Child Care.  Over the course of the next two months, David was placed in PA Child Care, then moved to Camp

Adams because of space constraints, and then moved back to PA Child Care. Within the two months, he was moved back and forth between PA Child Care and Camp Adams several times.

342. David and his mother were ordered to pay $35 per month to Juvenile Probation to cover the costs of his placement and supervision.

## Michael S. Scarlato and his parents, Michael P. and Tina Scarlato

343. Michael S. Scarlato, now eighteen years old, is the son of Michael P. and Tina Scarlato of Hazelton, Pennsylvania.

344. In November 2004, when Michael was fourteen years old, he was adjudicated delinquent on a charge of possession of drug paraphernalia for bringing a pipe to school. Unrepresented by counsel, Michael made an admission. Ciavarella did not inform Michael that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Michael of waiving his right to counsel and of waiving his right to trial by pleading guilty.

345. Ciavarella placed Michael at Camp Adams. Over the next four years, Michael was in various court-ordered placements, including PA Child Care and Western PA Child Care.

346.    During that time, Michael's parents were ordered to and paid approximately $2,500 to the court for Michael's placements.  Additionally, Michael has paid and continues to make payments to Juvenile Probation.

A.S., through and with his next friend and father, G.S.

347.    A.S., now fifteen years old, is the son of G.S. and K.S. of Wilkes-Barre, Pennsylvania.

348.    In 2007, when he was fourteen years old, A.S. was adjudicated delinquent by Ciavarella for writing graffiti with a group of kids.  A.S. was unrepresented when he plead guilty before Ciavarella.  Ciavarella did not inform A.S. that he had a right to an attorney and that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to A.S. of waiving his right to counsel or of waiving his right to trial by pleading guilty.

349.    Ciavarella ordered that A.S. be placed in Camp Adams for ninety days.

350.    A.S.'s parents were ordered to pay $140 per month to the court to defray the cost of his placement in Camp Adams; the monies were taken out of his father's unemployment checks.  A.S. himself was ordered to pay $30 a month when he was placed on probation after being released from Camp Adams.

James Swartley

351.   James Swartley, now nineteen years old, is the son of Amy Swartley of

Wilkes-Barre, Pennsylvania.

352.   In 2005, when he was sixteen years old, James was adjudicated delinquent

by Ciavarella on a misdemeanor charge of possession of drug

paraphernalia.  James was placed at PA Child Care prior to his hearing.

When he appeared before Ciavarella, James was unrepresented by counsel

and pled guilty.  Ciavarella did not inform James that he had a right to an

attorney or that the court would appoint an attorney if he could not afford

one.  Nor did Ciavarella explain the potential consequences to James of

waiving his right to counsel and of waiving his right to trial by pleading

guilty.

353.   Ciavarella ordered that James return to PA Child Care.  James was detained

at PA Child Care for approximately eleven days before he was sent home

and placed on probation.

354.   Over the next two years, Ciavarella placed James in two separate facilities

for allegedly violating a term of the probation he was still serving.  In total,

James spent more than a year in placement.

355.   James's mother's wages were garnished while James was in placement;

about $110 was deducted every two weeks.  James's father had paid $240

per month in child support.  The court redirected the child support

payments to Juvenile Probation while James was in placement.

Jessica Thurston and her mother, Barbara Thurston

356.    Jessica Thurston, now twenty years old, is the daughter of Barbara

Thurston of Wilkes-Barre, Pennsylvania.

357.    In 2003, when Jessica was fourteen years old, she was adjudicated

delinquent for fighting and theft.  Jessica appeared before Ciavarella

without counsel and pled guilty.  Ciavarella did not inform Jessica that she

had a right to an attorney or that the court would appoint an attorney if she

could not afford one.  Nor did Ciavarella explain the potential

consequences to Barbara of waiving her right to counsel and of waiving her

right to trial by pleading guilty.

358.    Upon Ciavarella's order, Jessica was placed in PA Child Care for

approximately two weeks, and then she was placed at Camp Adams and

another facility in Tioga County for five to six months.

359.    Jessica's mother was ordered to pay fees and costs to the court.  Jessica

was receiving Supplemental Security Income and her SSI check was

garnished to offset the costs of supervision and placement.

Michael Vitali

360.    Michael Vitali, now twenty-two years old, is the son of Eugene and Joan
        Vitali of Wilkes-Barre, Pennsylvania.

361.    In 2002, when Michael was fifteen years old, he was charged with assault.
        At his adjudicatory hearing before Ciavarella, he was unrepresented by
        counsel.  No colloquy was conducted on his waiver of counsel.  Neither
        Michael nor his parents recall Michael being asked to plead guilty or not
        guilty, and neither remember Ciavarella explaining to Michael his rights.

362.    Following that adjudication, Michael was placed in Camp Adams for three
        months.  Later, he was in and out of various placements, including PA
        Child Care, for probation violations.  He was not represented by counsel at
        the probation violation hearings.

363.    As a result of his placements, both Michael and his parents received a bill
        from the court to cover the costs of his supervision and placement.  They
        have paid over $1,000 to the court.

364.    As a result of Michael's time in placement, he struggled when he returned
        to school and opted to take the GED instead.  Michael also suffered great
        psychological harm and was placed on a variety of medications while at
        KidsPeace that caused him to gain significant weight.

Frank Weber and his mother Florence Myers

365. Frank Weber, now twenty-three years old, is the son of Florence Myers of Wilkes-Barre, Pennsylvania.

366. In 1997, when he was thirteen years old, Frank was a passenger in a car that was reported stolen; the driver of the car got into an accident. Frank was adjudicated delinquent by Ciavarella on various charges related to this incident. Frank was unrepresented by counsel at the adjudicatory hearing. Ciavarella did not inform Frank that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Frank of waiving his right to counsel.

367. Until Frank turned eighteen, he spent the majority of time in various court-ordered placements including PA Child Care. These continued periods of placement resulted from violations of probation on the original charge when Frank was thirteen years old. He was not represented by an attorney at any of these violations hearings.

368. Frank's father paid $400 a month in child support to Juvenile Probation for the cost of placement for the duration of the time that Frank was in placement.

74

<u>M.M.W., through and with her next friend and legal guardian, J.C.</u>

369.    M.M.W., now fourteen years of age, resides with her guardian J.C. in

Freedland, Pennsylvania.

370.    When she was ten years old, M.M.W. was adjudicated delinquent by

Ciavarella.  Prior to appearing before Ciavarella, M.M.W. was taken by

police to PA Child Care, where she was held for a week without a hearing.

M.M.W. was unrepresented at her adjudicatory hearing.  Ciavarella did not

inform M.M.W. that she had a right to an attorney or that the court would

appoint an attorney if she could not afford one.  Nor did Ciavarella explain

the potential consequences to M.M.W. of waiving her right to counsel.

371.    M.M.W. returned to PA Child Care, where she spent approximately one

month.  She was on probation for a year after she was released from PA

Child Care.

372.    M.M.W.'s guardian had to pay at least $200 to the court.

<u>John Ashford, Jr. and his mother, Donna Ashford</u>

373.    John Ashford, Jr., now twenty-one years of age, is the son of Donna

Ashford of Wilkes-Barre, Pennsylvania.

374.    In October 2005, John, then sixteen years old, and three of his friends were

charged with a misdemeanor for shooting some windows with a BB gun.

Except for this charge, John has never been in trouble with the law.

375.   John was represented at his adjudicatory hearing before Ciavarella by a public defender.  However, each time the public defender attempted to speak, Ciavarella cut her off.  The homeowner whose windows were broken spoke on the boys' behalf and asked Ciavarella not to send them away.

376.   After adjudicating John delinquent, Ciavarella ordered that John be placed at Camp Adams, where he remained for ninety-seven days.

377.   John's parents were ordered to and paid monies to PA SCDU for John's placement at Camp Adams.  John and his parents also were ordered to and paid fees and costs to the court.  In total, the family paid more than $5,000.

Shane Bly

378.   Shane Bly, now twenty years old, is the son of Linda Bly of Sugar Notch, Pennsylvania.

379.   In May 2005, when Shane was sixteen years old, he was adjudicated delinquent by Ciavarella.  Represented by counsel, Shane pled guilty. Ciavarella did not conduct a colloquy to inform Shane of the rights he would be giving up if he pled guilty, nor did he explain to Shane the potential consequences of pleading guilty.

380.   Upon Ciavarella's order, Shane was sent to Camp Adams for three months and then placed on probation when he returned home.

381.   In 2006, Shane appeared with an attorney before Ciavarella at a probation violation hearing.  Upon Ciavarella's order, Shane was placed at two other facilities for a total of six months.

382.   During the three months that Shane was in Camp Adams in 2005, the court garnished $85.38 per week from the paycheck of Shane's father. Consequently, Shane's parents had to take out loans to cover mortgage payments on their home.  The court also ordered Shane to pay $469 in restitution and $35 a month to the court while he was on probation.

G.B., through and with his next friends and parents, P.P. and J.B.

383.   G.B., now seventeen years old, is the son of P.P. and J.B. of Larksville, Pennsylvania.

384.   In 2005, when G.B. was fourteen years old, he was adjudicated delinquent by Ciavarella on a misdemeanor charge.  When G.B. appeared before Ciavarella for the first time, his case had been transferred from Wayne County.  G.B. was represented by a private attorney, but the attorney was not permitted to present any evidence as to G.B.'s mental capacity or learning disability.  G.B. pled guilty.  Ciavarella did not conduct a colloquy to inform Shane of the rights he would be giving up if he pled guilty, nor did he explain to Shane the potential consequences of pleading guilty.

385.   Upon adjudication, Ciavarella placed G.B. at PA Child Care, where he remained for a month.  He was then placed in other facilities, including Western PA Child Care for four months.

386.   G.B.'s mother received a notice ordering her to pay a lump sum of $500 for his placement.  She was also ordered to pay $35 per month for the cost of his supervision on probation.  She is currently making these monthly payments.

Daryl Charles and his mother, Liza Charles

387.   Daryl Charles, now twenty-years of age, is from Wilkes-Barre, Pennsylvania.  He is the son of Liza Charles.

388.   In October 2005, when he was seventeen years old, Daryl was adjudicated delinquent by Ciavarella for shooting a BB gun out of a window one night. Represented by counsel, Daryl pled guilty.  Ciavarella did not conduct a colloquy to inform Daryl of the rights he would be giving up if he pled guilty, nor did he explain to Daryl the potential consequences of pleading guilty.

389.   Ciavarella ordered Daryl placed at Camp Adams, where he remained for twenty-seven days.  After his release, Daryl was placed on probation.

390.   Daryl paid $401.42 in fees and costs to the court between November 2005 and January 2006.

William Clarke

391.   William Clarke, now twenty-three years old, is from Bear Creek Township, Pennsylvania.

392.   In March 2003, when he was seventeen years old, William was adjudicated delinquent by Ciavarella on a simple assault charge for getting into a fight. Prior to his hearing, William was taken to Northwest Academy and then transferred to PA Child Care.  William was represented by counsel when he appeared before Ciavarella.  However, the attorney was not allowed to speak.  Ciavarella read the charge and then said "you're done."  William does not recall actually pleading guilty.

393.   Upon Ciavarella's order, William spent three months at PA Child Care and three months at another facility.  He was sent home in September 2003 and placed on probation for six months.

394.   William's father was ordered to and paid money to the court for William's placements.  William was ordered to and paid restitution in the amount of $3,000.

Glenn Cooper and his mother, Karen Cooper

395.   Glenn Cooper, now twenty-one years old, is the son of Karen and David Cooper of Meshoppen, Pennsylvania.

396.    In 2003, when he was fifteen years old, Glenn was adjudicated delinquent

by Ciavarella for simple assault.  Glenn pled not guilty.  Glenn was

represented by private counsel at his hearing; however, Ciavarella would

not permit his attorney to speak.

397.    Ciavarella initially placed Glenn at PA Child Care and subsequently placed

him at several other facilities throughout the state.

398.    Glenn's parents were ordered to pay the costs of his placements in various

facilities.  To date, they have paid several hundred dollars, but they believe

that they still owe approximately $1,000.

Richard Copeland II and his parents, Donna and Richard Copeland

399.    Richard Copeland II, now twenty years old, is the son of Donna and

Richard Copeland of Sugar Notch, Pennsylvania.

400.    In 2005, when he was sixteen years old, Richard was adjudicated

delinquent by Ciavarella when he appeared with counsel at a hearing.

Ciavarella asked Richard whether he was guilty, but did not explain the

legal rights Richard would relinquish or the consequences he would

experience by pleading guilty.  Richard stated that he was not guilty.

401.    Ciavarella then ordered that Richard be returned to PA Child Care, where

Richard was placed prior to the hearing.  Richard was kept at PA Child

Care for approximately seventy-four days between August and October

2005.  After returning home from PA Child Care, Richard was placed on probation.

402.  Soon after Richard returned home, his probation officer accused him of violating his curfew.  As punishment for the alleged curfew violation, Richard was sent to a facility for two weekends.

403.  Richard's parents were ordered to and paid $2,700 to Juvenile Probation to cover the costs of Richard's placements.  Richard was ordered to and is paying $35 per month to cover the cost of his probation.  In addition, Richard was ordered to pay $30,000 for restitution.  Richard and his parents have paid approximately $275 per month for restitution over the past four years.

Chad Derhammer

404.  Chad Derhammer, now twenty-three years old, is the son of Tammy Ruger of Dallas, Pennsylvania.

405.  In November 2003, when Chad was seventeen years old, he and three other boys from his high school were charged with simple assault and harassment for an incident of hazing.  Although all the boys were represented by counsel at the adjudicatory hearing, none of the lawyers were permitted to speak and neither were the boys' parents.  Chad pled guilty.  Ciavarella did not conduct a colloquy to inform Chad of the rights

he would be giving up if he pled guilty, nor did he explain to Chad the potential consequences of pleading guilty.

406.   Although Chad had no prior contact with the juvenile delinquency system, Ciavarella placed him in PA Child Care, where he remained for two weeks.

407.   Chad and his family were ordered to pay fees, costs, and restitution to the court.  His parents were also ordered to pay Juvenile Probation the cost of his placement in PA Child Care as well as his supervision while on probation.

## A.D., through and with her mother and next friend, J.E.

408.   A.D., now age seventeen years old, is the daughter of J.E. of Plymouth, Pennsylvania.

409.   On or about 2004, at age thirteen, A.D. was adjudicated delinquent by Ciavarella on various charges related to being a passenger in the car of a friend that belonged to the friend's grandmother.  At the hearing, A.D. was represented by a private attorney and pled guilty.  Ciavarella did not conduct a colloquy to inform A.D. of the rights she would be giving up if she pled guilty, nor did he explain to A.D. the potential consequences of pleading guilty.

410.   Upon Ciavarella's order, A.D. spent about six hours at PA Child Care and was then placed on probation for three months.

411.    A.D. and her family were ordered to and paid $420 in supervision fees.

412.    At age sixteen, A.D. was again adjudicated delinquent by Ciavarella on a charge of terroristic threats for something she said at school.  A.D. appeared without counsel at this hearing.  A.D. tried to tell her side of the story and to present letters from teachers in her support.  She pled guilty.  Ciavarella did not inform A.D. that she had a right to an attorney or that the court would appoint an attorney if she could not afford one.  Nor did Ciavarella explain the potential consequences to A.D. of waiving her right to counsel and of waiving her right to trial by pleading guilty.

413.    A.D. was sent to Camp Adams for three months.  A.D.'s mother's wages were garnished.  She paid about $300 to Juvenile Probation for the cost of placement.

Matthew Dougherty

414.    Matthew Dougherty, now twenty-one years old, is the son of Joelle Dougherty of Pittston, Pennsylvania.

415.    In May 2006, when he was eighteen years old, Matthew was adjudicated delinquent for graffiti writing, stemming from an incident that allegedly occurred before Matthew turned eighteen.

416.    Matthew appeared with private counsel before Ciavarella.  Matthew's mother recalls that the attorney said very little during the hearing and that

there was no opportunity to contest the charges. Matthew did not plead guilty or make an admission on the record. Ciavarella did not conduct a colloquy informing Matthew of his right to go to trial or the potential consequences of pleading guilty. Nevertheless, Ciavarella adjudicated him guilty.

417.    Upon Ciavarella's order, Matthew was placed at Camp Adams for approximately six weeks.

418.    Matthew and his mother were ordered to and paid various fees and costs to the Juvenile Probation department.

<u>E.E., through and with her next friend and mother, H.E.</u>

419.    E.E., now fourteen years old, is the daughter of H.E. of Wilkes-Barre, Pennsylvania.

420.    In 2007, when she was thirteen years old, E.E. was adjudicated delinquent by Ciavarella on charges of disorderly conduct and harassment after getting in a fight on a school bus on her way to elementary school. E.E. was represented by a public defender. Ciavarella presumed E.E. was guilty and asked her why she did it. When E.E. did not respond, but instead started crying, Ciavarella told her that he was going to send her to Camp Adams for three months because she would not respond to his questions.

Ciavarella did not conduct a colloquy informing E.E. of her right to go to trial or the potential consequences of pleading guilty.

421.   Even though this was E.E.'s first offense, Ciavarella ordered her placed at Camp Adams for three months.  Though E.E. is in special education and has an IEP, she did not receive any special education services while at Camp Adams.

422.   H.E. was charged a total of $450 for psychological testing and maintenance fees.  She still owes $350.

K.E., through and with her next friend and mother, H.E.

423.   K.E., now fifteen years old, is the daughter of H.E. of Wilkes-Barre, Pennsylvania.

424.   In 2007, when she was fourteen years old, K.E. was adjudicated delinquent by Ciavarella on charges of criminal trespass, simple assault, and harassment after getting into a fight on school grounds.  K.E. was represented by a public defender.  K.E. pled guilty.  H.E. recalls Ciavarella asking questions when K.E. pled guilty, but he asked them so quickly that K.E. could not understand what he was asking.

425.   Even though this was K.E.'s first offense, Ciavarella ordered her placed at Camp Adams for three months, followed by three months of probation. She was not allowed to return to public school after her placement.

426.   H.E. was charged $310 in maintenance fees and for psychological evaluations.  She still owes this money.

L.E., through and with his next friend and mother, H.E.

427.   L.E., now seventeen years old, is the son of H.E. of Wilkes-Barre, Pennsylvania.

428.   In 2007, when he was fifteen years old, L.E. was adjudicated delinquent by Ciavarella for a giving false identification to a police officer.  L.E. was represented by a public defender and put on probation.  When he missed curfew a couple of times, he was charged with violating his probation.  At the hearing, Ciavarella automatically treated him as guilty.  H.E. does not recall if L.E. pled guilty.

429.   Ciavarella ordered that L.E. be placed in Camp Adams for three months.  L.E. was sent to PA Child Care for a week or two before going to Camp Adams.  He was placed on probation upon his release from Camp Adams.

430.   In May 2008, when L.E. was sixteen years old, L.E. was adjudicated delinquent by Ciavarella for simple assault and theft for allegedly hitting a child and taking his basketball.  H.E. does not recall L.E. pleading guilty to the charges or Ciavarella conducting a colloquy informing L.E. of his right to go to trial or the potential consequences of pleading guilty.  Nevertheless, Ciavarella adjudicated him delinquent.

431.   L.E. was sentenced to one to three years in placement.  He expects to be released in June 2009.

432.   L.E. had to pay money upon his release from Camp Adams.  A portion of H.E.'s child support payments also paid for his subsequent placement.

A.F. and L.F., through and with their mother and next friend, M.F.

433.   A.F., seventeen years old, and her sister, L.F., nineteen years old, reside with their mother, M.F., in Drums, Pennsylvania.

434.   In July 2007, A.F., then sixteen years old, and L.F., then seventeen years old, were adjudicated by Ciavarella on charges of criminal mischief. Although A.F. and L.F. were represented by counsel, neither their attorney nor their mother was allowed to say anything at the adjudicatory hearing. A.F. and L.F. both pled guilty.  Ciavarella did not conduct a colloquy to inform A.F. and L.F. of the rights they would be giving up if they pled guilty, nor did he explain to A.F. and L.F. the potential consequences of pleading guilty.

435.   Ciavarella committed A.F. and L.F. to Camp Adams; they remained there from July 24, 2007 through October 23, 2007.  When they returned home, they were placed on probation.

436.    A.F., L.F., and their mother were ordered to and paid $2,325.57 in various fees and costs to the court.  Their mother also paid $1,000 to retain a private attorney.

J.D.F., through and with his next friend and mother, M.W.

437.    J.D.F., now sixteen years old, is the son of M.W of Exeter, Pennsylvania.

438.    In 2006, J.D.F. was adjudicated delinquent in Montgomery County and his case was transferred to Luzerne County.  Ciavarella placed him in PA Child Care for over two years.

439.    The county sought payment from M.W. to cover the costs of her son's placement.  However, because she is unemployed, M.W. has not been able to make any payment.

440.    J.D.F. has now been in placement for almost three years.

J.F., through and with his next friend and mother, A.I.K.

441.    J.F., now fourteen, is the son of A.I.K. of Nanticoke, Pennsylvania.

442.    In 2008, J.F. was adjudicated delinquent by Ciavarella.  J.F. was represented by private counsel who entered a guilty plea on J.F.'s behalf. J.F. and his mother told the attorney that J.F. would not plead guilty, especially after they were informed by a representative of the District Attorney that the only witness recanted his statement.  Private counsel told

J.F. and his mother not to speak in court.  Ciavarella did not explain to J.F. the consequences of pleading guilty or his right to a trial.

443.   J.F. was placed on house arrest for three months.

444.   J.F. and his mother were ordered to and paid to Juvenile Probation about $375 for supervision fees.  J.F.'s mother still owes $200 for the cost of a court-ordered evaluation completed by Dr. Vita.

Alexandra Fahey

445.   Alexandra Fahey, now nineteen years old, is the daughter of Robert II and Maria Fahey of Pittston, Pennsylvania.

446.   In 2004, when she was fourteen years old, Alexandra was adjudicated delinquent by Ciavarella for assaulting a police officer who had detained her.  Alexandra, who was represented by a private attorney at the hearing, pled guilty.  Ciavarella did not conduct a colloquy to inform Alexandra of the rights she would be giving up if she pled guilty, nor did he explain to Alexandra the potential consequences of pleading guilty.

447.   Despite having no prior record, Alexandra was placed on house arrest and was made to wear an ankle bracelet for three months.  She was subsequently on probation for six months.

448.   Alexandra's family was ordered to and paid costs to Juvenile Probation during both her house arrest and her probation.

L.H., through and with her next friend and mother, J.M.

449.   L.H., now sixteen, is the daughter of J.M. of Wilkes-Barre, Pennsylvania.

450.   When she was fifteen, L.H. was adjudicated delinquent by Ciavarella for disorderly conduct after she was in an argument in school that escalated. Although L.H. was represented by the public defender, she did not understand what was going on at the hearing or what her rights were.  L.H. and her mother are not sure if she pled guilty.

451.   Upon Ciavarella's order, L.H. was shackled and sent to Camp Adams, where she remained committed from August to November 2007.

452.   Juvenile Probation garnished J.M.'s Supplemental Security Income for the cost of placement; to the best of her recollection this totaled more than $2,000.  L.H. and her mother were also ordered to and paid about $300 in fees to Juvenile Probation.

Michael Haines and his mother, Barbara Haines

453.   Michael Haines is nineteen years old and is the son of Barbara Haines of Dallas, Pennsylvania.

454.   In July 2007, when he was seventeen, Michael was adjudicated delinquent by Ciavarella on a theft charge for using a snow board that was on a rack outside of a ski lodge.  Michael appeared with an attorney, but neither his lawyer nor his mother was allowed to speak.  Michael pled guilty.

Ciavarella did not conduct a colloquy to inform Michael of the rights he would be giving up if he pled guilty, nor did he explain to Michael the potential consequences of pleading guilty.

455.    Michael was ordered to Camp Adams for thirty days.

456.    Michael's mother paid approximately $400 to Juvenile Probation for the placement.  Michael and his mother were ordered to and are still paying fees and costs to Juvenile Probation; they estimate that to date they have paid $630.

Edward Kane, Jr.

457.    Edward Kane, Jr., now twenty-two years old, is the grandson of Joanne Golden of Swoyersville, Pennsylvania.

458.    In 2003, when Edward was sixteen years old, he was adjudicated delinquent on a misdemeanor charge by Ciavarella.  Edward was represented by a public defender.  The youth who pressed a simple assault charge against Edward did not appear, so that charge was dismissed.  A second charge of criminal trespass was reduced to a misdemeanor. Ciavarella also told Edward that he had an unpaid fine.  Edward does not recall pleading guilty to any charge.

459.    Ciavarella sent Edward to Camp Adams for ninety days and ordered Edward to pay the unpaid fine.  Edward's grandmother immediately paid

the fine on Edward's behalf.  Edward was put on probation after his release.

460.    In spring 2003, two or three weeks after his release from Camp Adams, Edward was picked up by his probation officer and taken to PA Child Care. He was transferred among three different facilities, including PA Child Care, for three to four weeks before having a hearing.

461.    When Edward appeared before Ciavarella for his probation violation hearing, he did not have a lawyer, and no one advised him that he should have an attorney.  Ciavarella remanded Edward to Camp Adams for six months based on an accusation that Edward had been drinking while on probation.

462.    In 2004, Edward was again placed in PA Child Care due to a probation violation.

463.    Within a month of being placed there, he had a hearing before Ciavarella. He was not represented by counsel at that hearing, nor did anyone advise him that he should have an attorney.  Ciavarella issued an order placing Edward at Northwestern Boot Camp.  Before Edward left the courthouse that day, a probation officer spoke with Edward's mother about his lack of representation in the hearing.  Edward had another hearing before Ciavarella that same day.  At the later hearing, the probation officer stated

92

that Edward was entitled to have a lawyer represent him and that the earlier

hearing should be postponed until Edward had a lawyer.  Ciavarella

vacated the order placing Edward at Northwestern Boot Camp and

scheduled another hearing.  Edward was sent back to PA Child Care.

464.   A few weeks later, Edward appeared before Ciavarella again and was

represented by private counsel.  Edward was placed in PA Child Care for

another month and a half and then sent to Manose House for six months.

Edward was released from Manose House in October 2004.

465.   Edward, his parents, and his grandmother were ordered to and paid fees

and costs to the court.  Edward believes that his parents each still owe

approximately $400 to $500.  Edward was ordered to pay more than $750

to Juvenile Probation in supervision fees, processing fees, court costs, and

fines.  He was also ordered to pay $535.50 to Juvenile Probation in

restitution fees.


Brianna Kee

466.   Brianna Kee, age eighteen, is the daughter of Cheral and Talif Thomas of

Wilkes-Barre, Pennsylvania.

467.   In 2007, when Brianna was seventeen years old, she and two other children

were adjudicated delinquent on criminal trespass and misdemeanor theft

charges for going into an unlocked, empty building.

468.    By the time Brianna appeared with an attorney before Ciavarella, the two

other children had already been adjudicated and received their

dispositions – one was sent to Camp Adams, the other was put on a work

program.  When Brianna's attorney addressed Ciavarella, Ciavarella asked

and was told by courtroom personnel what disposition the two other

children received.  Ciavarella immediately ordered that Brianna be placed

at Camp Adams, where she remained for three months, from September 5

through November 27, 2007.

469.    Brianna and her mother do not recall that Brianna actually pled guilty

before Ciavarella.  Ciavarella never explained to Brianna her rights or the

consequences of pleading guilty.

470.    Brianna and her parents were ordered to and paid fees and costs to the

court; the court garnished the paychecks of both of Brianna's parents.

Matthew Kopetchny

471.    Matthew Kopetchny is the twenty-year-old son of Angelique Ronchetti of

Kingston, Pennsylvania.

472.    In 2005, when he was sixteen years old, Matthew was adjudicated

delinquent by Ciavarella for shoplifting videos and video games.  Matthew

appeared with an attorney before Ciavarella and pled guilty.  Ciavarella did

not conduct a colloquy to inform Matthew of the rights he would be giving

94

up if he pled guilty, nor did he explain to Matthew the potential consequences of pleading guilty.

473.     Matthew was initially placed on house arrest, but he violated the terms. When he appeared before Ciavarella for a probation violation hearing at which he was not represented by an attorney, Ciavarella ordered Matthew placed at PA Child Care, where he remained for three months before being sent to another facility for approximately one year.

474.     Mathew's family was ordered to and paid monies to Juvenile Probation for his placements.  In addition, Matthew and his mother paid $300 in fees and costs to Juvenile Probation.

Magee Mott

475.     Magee Mott, now twenty-three, is the daughter of Bill and Leann Mott of Pittston, Pennsylvania.

476.     In 2002, when Magee was seventeen years old, she was adjudicated delinquent by Ciavarella for drug possession.

477.     Magee was represented by the public defender at her adjudication hearing. She believes she might have pled guilty, but she does not recall ever being told of the consequences of pleading guilty or her right to a trial.

478.     Magee was placed at PA Childcare for a few days and then ordered to spend ten months at another facility.

479.     Until Magee turned eighteen, she spent most of her time in placement,
         including three of four times at PA Child Care.  These placements were
         ordered as a result of probation violations, such as curfew violations and
         running away.

480.     Magee was never represented by an attorney at any of the probation
         violation hearings.  She was never informed of her right to counsel or the
         consequences of waiving that right.

481.     Magee's parents believe that during the course of Magee's court-ordered
         placement, they paid several thousand dollars to Juvenile Probation.
         Magee's mother had her wages garnished.  Magee's father was jailed for
         failing to pay the monies to Juvenile Probation, and Magee's mother had to
         pay $1,200 to bail him out.  Magee believes she still owes money to
         Juvenile Probation and that her credit report now shows this debt.

G.M., through and with his mother and next friend, F.M.

482.     G.M., now age fifteen, is the son of F.M. of Wilkes-Barre, Pennsylvania.

483.     In 2008, when G.M. was fourteen years old, he was adjudicated delinquent
         by Ciavarella for breaking into and entering the home of a family member.
         Prior to his hearing, G.M. was detained.  When he appeared before
         Ciavarella, he did not have an attorney.  Ciavarella did not inform G.M.
         that he had a right to an attorney or that the court would appoint an attorney

if he could not afford one.  G.M.'s mother left the courtroom and searched the building to try to get an attorney to represent G.M.  In the middle of the hearing, an attorney came up to represent G.M.  Even though the family member did not want to press charges against G.M. and it was G.M.'s first offense, G.M. pled guilty.  Ciavarella did not conduct a colloquy to inform G.M. of the rights he would be giving up if he pled guilty, nor did he explain to G.M. the potential consequences of pleading guilty.

484.   G.M. was placed for about one month at PA Child Care, one month at Western PA Child Care, and two months at Camp Adams.  G.M. is still on probation.

485.   While G.M. was in placement, the court garnished his disability checks.  G.M.'s mother still owes costs and fees to the court.

Sarah Myers and Florence Myers

486.   Sarah Myers, now nineteen years old, is the daughter of Florence Myers of Wilkes-Barre, Pennsylvania.

487.   In 2003, when Sarah was thirteen years old, she was adjudicated delinquent by Ciavarella for taking a bike and change from abandoned cars.

488.   Prior to appearing before Ciavarella, Sarah was arrested and taken to PA Child Care.  Her mother was not permitted to see her despite her requests.

489.    When they appeared in court before Ciavarella, Sarah's mother requested an attorney for her daughter.  She was told that a particular public defender would represent Sarah.  Her mother asked that another attorney be appointed because that attorney had represented Sarah's father in a protection-from-abuse proceeding in which Sarah's mother was the petitioner.  This request was refused.

490.    At this hearing, Sarah told her public defender that she would not plead guilty because she did not commit the crimes of which she was accused.  Her public defender told her that Ciavarella would not agree to that and would send her away.  Ciavarella adjudicated Sarah delinquent, but Sarah is not sure if she pled guilty or not.

491.    Upon Ciavarella's order, Sarah was returned to PA Child Care and was then sent to Camp Adams for about ninety days.

492.    When Sarah finally returned home from Camp Adams, she was extremely angry.  She began cutting herself and was hospitalized.  Due to these issues, Sarah was charged with a probation violation.  Sarah's mother does not recall having counsel at that hearing despite her requests.

493.    Pursuant to Ciavarella's orders, Sarah was placed in various facilities including PA Child Care and Western PA Child Care.

494.    Since leaving placement, Sarah has been in and out of hospitals because of
        her mental health disorders.

495.    The money that Sarah's father paid to her mother for child support went
        instead to Juvenile Probation for the cost of Sarah's placements.  Sarah's
        mother believes that Sarah's Supplemental Security Income check was also
        directed to Juvenile Probation for the cost of the placements.

Krystal Pope

496.    Krystal Pope, now nineteen years old, resides in Kingston, Pennsylvania.

497.    In 2006, when she was seventeen years old, Krystal was adjudicated
        delinquent for possession of drugs and drug paraphernalia.  At the
        adjudication hearing, Krystal was represented by a public defender and she
        pled guilty.  Ciavarella did not conduct a colloquy to inform Krystal of the
        rights she would be giving up if she pled guilty, nor did he explain to
        Krystal the potential consequences of pleading guilty.

498.    Despite having no prior record, Krystal was placed in the Youth Services
        Agency at Wind Gap for three months.  Following her release, Krystal was
        placed on probation for six months.

499.    Krystal and her mother were ordered to and paid approximately $500 in
        various costs and fees to Juvenile Probation.

Lisa Scarbrough and her mother, Laurie Scarbrough

500.    Lisa Scarbrough is currently a twenty-one year old college student.  She is the daughter of Laurie Scarbrough of Mountain Top, Pennsylvania.

501.    In 2003, Lisa, then sixteen, was arrested on a charge of making terroristic threats.  When Lisa was arrested, the officers took her to PA Child Care, where she remained for six days – including Thanksgiving weekend – without a hearing.  Lisa had no prior contact with law enforcement.

502.    On December 1, 2003, Lisa appeared before Ciavarella.  Lisa, who was represented by counsel, brought several witnesses to testify on her behalf at the hearing; however, Ciavarella did not allow them to speak.  Lisa's principal, however, was permitted to testify on behalf of the state.

503.    Ciavarella placed Lisa at Camp Adams for an indefinite period; she stayed there for nine days.

504.    Lisa and her parents were ordered to and paid fees and costs to the court.

Marshonda Seward

505.    Marshonda Seward, now nineteen years old, is the daughter of Olanda Carter of Wilkes-Barre, Pennsylvania.

506.    In 2006, when she was sixteen years old, Marshonda was adjudicated delinquent on an assault charge that arose out of a neighborhood fight.  At the adjudication hearing, Marshonda was represented by a public defender.

Marshonda never entered a guilty plea, but she and all the other children involved in the fight were adjudicated delinquent by Ciavarella.

507.   Marshonda was placed at Camp Adams for three months, after which she was sent home and placed on probation for six months.

508.   Marshonda's family was ordered to and paid fees and costs to the court, as well as $30 monthly to Juvenile Probation during her six months of probation.

<u>J.S., through and with his next friend and mother C.S.</u>

509.   J.S. is fifteen years old and resides with his mother C.S. in Plymouth, Pennsylvania.

510.   In March of 2007, when he was thirteen years old, J.S. was adjudicated delinquent by Ciavarella on charges of burglary, criminal trespass, theft by unlawful taking, receiving stolen property, and criminal conspiracy.

511.   When J.S. appeared before Ciavarella, a public defender with whom J.S. had not previously spoken represented J.S.  Ciavarella adjudicated J.S. delinquent after J.S. admitted to the charges.  Ciavarella did not conduct a colloquy to inform J.S. of the rights he would be giving up if he pled guilty, nor did he explain to J.S. the potential consequences of pleading guilty.

512.   Ciavarella ordered J.S. into placement at Camp Adams, where he remained for four months.

513.    J.S.'s Access Card was taken away from him and he was removed from his

mother's food stamps.  His mother received approximately $130 less a

month in food stamps.  J.S. is currently back on food stamps, but his

Access Card has not been returned to him.

514.    J.S. worked at Camp Adams during his time there; the money he earned

there will go towards paying his probation costs.

Chad Uca

515.    Chad Uca, now eighteen years old, is the son of Ruby Uca of Hazleton,

Pennsylvania.

516.    In 2005, when Chad was fifteen years old, he was adjudicated delinquent

on a simple assault charge for pushing a fellow student who was bothering

a classmate.  At the brief hearing, Chad was represented by a public

defender who spoke very little.  Ciavarella did not permit anyone involved,

including the victim, to speak.  Chad pled guilty.  Ciavarella did not

conduct a colloquy to inform Chad of the rights he would be giving up if he

pled guilty, nor did he explain to Chad the potential consequences of

pleading guilty.

517.    Chad was ordered to Camp Adams, where he remained for more than

ninety days.

518.    Chad and Chad's mother were ordered to pay monies to the court to cover
        various costs and fees, including the cost of Chad's placement.  Over the
        course of six to nine months, Chad's mother paid $600 to $700.

W.U., through and with his next friend and mother, D.S.

519.    W.U., now fifteen years old, is the son of D.S. of Wilkes-Barre,
        Pennsylvania.

520.    In 2007, when he was fourteen years old, W.U. was adjudicated delinquent
        by Ciavarella for aggravated assault.  At the adjudication hearing, W.U.
        was represented by a private attorney and initially pled not guilty.
        Ciavarella pressured W.U. for an admission of guilt, and W.U. ultimately
        pled guilty.  Ciavarella did not conduct a colloquy to inform W.U. of the
        rights he would be giving up if he pled guilty, nor did he explain to W.U.
        the potential consequences of pleading guilty.

521.    W.U. was placed on indefinite probation after the hearing, but he was
        finally taken off probation after six months.

522.    During the six months of probation, D.S. was ordered to and paid $35
        monthly to Juvenile Probation.  Furthermore, she was ordered to and paid
        approximately $110 in initial court fees and costs after the hearing.

B.R.W., through and with his next friends and parents, C.W. and S.W.

523.    B.R.W. is the fifteen-year-old son of C.W. and S.W. of Wilkes-Barre,

Pennsylvania.

524.    On March 21, 2006, B.R.W., then thirteen years old, was adjudicated

delinquent by Ciavarella.  B.R.W., who denied the charge, was represented

by private counsel.  While the complaining witness was allowed to testify,

B.R.W.'s attorney was not allowed to speak or cross examine the witness.

525.    At the end of a "trial" that took less than three minutes, B.R.W. was

handcuffed and shackled and placed at PA Child Care, where he remained

until April 17, 2006.

526.    When he returned home, B.R.W. was placed on intensive probation.

B.R.W. remained on probation until October 2, 2006, when probation

recommended that B.R.W.'s probation be terminated because he had

complied with all the terms and had no further violations.

527.    B.R.W. and his parents C.W. and S.W. were ordered to and have paid

approximately $870 in costs and fees to the court.

**B.      SECRET AGREEMENTS AND CONSTRUCTION OF DETENTION
FACILITIES**

528.    Beginning in June 2000, Ciavarella, in his administrative capacity as a

juvenile court judge, and defendant Powell, an attorney in Luzerne County,

began discussions about constructing a new juvenile detention facility in Luzerne County.  Powell was interested in constructing such a facility. Ciavarella introduced Powell to his friend, defendant Mericle, the owner of defendant Mericle Construction.  Together, Powell and Mericle worked to locate land for the construction of such a facility.

529.   Powell and defendant Zappala, doing business as defendant PA Child Care, acquired land in Luzerne County.  They then entered into an agreement with Mericle and Mericle Construction to build a juvenile detention facility, and Mericle and Mericle Construction controlled the building of the facility.

530.   In July 2001, PA Child Care sent Luzerne County an unsolicited proposal to build a juvenile detention facility in Pittston Township and to lease the facility to the county for $37 million over 30 years.

531.   Specifically, on or about January 29, 2002, Conahan signed a secret "Placement Guarantee Agreement" between PA Child Care and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PA Child Care facility.  Under this agreement, the court would pay Child Care an annual sum of $1,314,000.  At the time, defendant Conahan, as President Judge of Luzerne County, oversaw the administration of the court and its departments.

105

532.    In October 2002, Conahan, acting in his administrative role as President
        Judge, announced that judges would no longer send youth to the county-run
        River Street juvenile detention center ("River Street facility").  Ciavarella
        and Conahan publicly maintained that conditions there were deplorable.  In
        November 2002, however, the state Department of Public Welfare deemed
        the River Street facility "safe and satisfactory" to house juveniles.  The
        state Labor and Industry Department and the Wilkes-Barre Health
        Department also determined that the building met applicable standards.

533.    In December 2002, Conahan, acting in his administrative role as President
        Judge, took official steps to remove funding from the Luzerne County
        budget for the River Street facility, effectively closing the county-run
        detention center.  The closing of this detention center helped ensure that
        youth in Luzerne County would be detained at the detention facility being
        built by Mericle and PA Child Care.

534.    In or before January 2003, defendants agreed that Powell and Mericle
        would pay $997,600 to Ciavarella and Conahan for their roles in
        facilitating the construction of the PA Child Care facility.

535.    This payment was concealed through a series of financial transactions as
        described in paragraphs 569 through 574, below.

536.   In February 2003, the PA Child Care facility opened in Pittston.  Luzerne
       County commissioners agreed to allow county juvenile offenders to be
       housed in the facility.  However, as of March 2003, Luzerne County
       commissioners were continuing to pursue plans to construct a new county-
       run juvenile detention facility, alleging that Powell, Zappala, and PA Child
       Care wanted to charge the county too much.  By 2004, newly-elected
       majority commissioners put these construction plans on hold.

537.   Due to the success of the PA Child Care facility, Powell and Zappala,
       doing business as defendant Western PA Child Care, constructed a juvenile
       detention facility in Butler County, Pennsylvania.  Powell and Zappala
       again contracted with Mericle and Mericle Construction to build the
       Western PA Child Care facility, and Mericle and Mericle Construction
       again controlled the building of the facility.  Conahan and Ciavarella were
       financially rewarded upon the completion of the facility in July 2005, when
       they received a $1,000,000 payment from Powell through defendant
       Pinnacle Group.

538.   This payment, too, was concealed as described in paragraphs 575 and 576,
       below.

539.   Powell and Zappala also built an addition to the PA Child Care detention
       facility in Luzerne County, again contracting with Mericle and Mericle

Construction.  When the addition was completed in February 2006, Powell and Mericle made another payment, this time of $150,000, to Conahan and Ciavarella through defendant Pinnacle Group.  The payment was concealed as described in paragraphs 577 and 578, below.

540.   In addition to these payments, between February 2003 and January 1, 2007, Powell made hundreds of thousands of dollars in concealed payments to Ciavarella and Conahan for their past and future acts relating to PA Child Care and Western PA Child Care.  These payments were made through Pinnacle Group, as described in paragraphs 579 through 582, below.

541.   In sum, Ciavarella and Conahan, in their administrative roles as judges in Luzerne County, caused Luzerne County to contract with PA Child Care and Western PA Child Care.  Conahan and Ciavarella assisted PA Child Care and Western PA Child Care to secure agreements with Luzerne County worth tens of millions of dollars over a period of years for the placement of juvenile offenders in the PA Child Care Facility, including an agreement in late 2004 worth approximately $58,000,000.

542.   Through the conspiracy described above, Conahan and Ciavarella received approximately $2.6 million in return.

**C.     IMPLEMENTATION OF CONSPIRACY TO DENY CLASS MEMBERS THEIR CONSTITUTIONAL RIGHTS**

543.    For defendants' scheme to succeed, Ciavarella and Conahan had to ensure that youth were placed at the facilities and that youth were not aware of Ciavarella's or Conahan's financial stake in their placement.  All defendants therefore acted in concert to conceal and disguise the existence, nature, location, source, ownership, and control of the money paid to Ciavarella and Conahan.

544.    In February 2003, Ciavarella began placing plaintiff youth in the PA Child Care facility.

545.    Ciavarella never informed plaintiffs that he had done business with PA Child Care or that he had a pecuniary interest in ensuring that youth were placed in PA Child Care.  Throughout the relevant time period, Ciavarella continued to receive payments from Powell, Mericle and PA Child Care. Ciavarella and Conahan concealed their financial relationship with PA Child Care from plaintiffs by, for example, filing materially false annual statements of financial interest with the Administrative Office of the Pennsylvania Courts, as described below in paragraphs 583 through 586.

546.    After the construction of PA Child Care, defendants' ability to maintain their association and continue their ongoing conspiracy depended on the continued profitability and viability of this private, for-profit facility.

547.   The consistent placement of youth at PA Child Care facilitated the subsequent construction of Western PA Child Care and the expansion of PA Child Care, directly benefiting PA Child Care, Western PA Child Care, and their owners and operators, as well as the contractor, Mericle, and Mericle Construction.  All defendants had a financial interest in placing juveniles in PA Child Care and Western PA Child Care.

548.   If youth from Luzerne County were not placed in PA Child Care or Western PA Child Care, the County would have discontinued contracting with PA Child Care and its private operators.  The owners and operators received a per diem reimbursement from the county for every child placed in the facilities.

549.   Ciavarella and Conahan received $997,600 from and through the other defendants for facilitating the construction of PA Child Care.  Upon the completion of Western PA Child Care and of the PA Child Care addition, Ciavarella and Conahan received $1,000,000 and $150,000, respectively. In addition to these payments, between February 2003 and January 1, 2007, Powell made hundreds of thousands of dollars in concealed payments to Ciavarella and Conahan for their past and future acts relating to PA Child Care and Western PA Child Care.  These payments were made through Pinnacle Group.  In total, Ciavarella and Conahan received more than $2.6

million in payments.  These payments were directly tied to the success of the detention facilities.

550.    From the opening of PA Child Care in February 2003 until May 23, 2008 (when Ciavarella ceased hearing juvenile cases), Ciavarella took steps to ensure that youth were routinely placed in detention, even in situations where detention was plainly not appropriate or over the objection of some probation officers.  These steps were taken as part of the conspiracy with all other defendants.

551.    The defendants had an interest in increasing overall adjudications and placements, not just adjudications that resulted in placements at PA Child Care and Western PA Child Care.  Youth who were adjudicated delinquent and placed at other facilities because of a lack of available space at PA Child Care or Western PA Child Care were transferred into PA Child Care or Western PA Child Care when space opened at PA Child Care or Western PA Child Care.  Youth were also often placed in PA Child Care or Western PA Child Care while they were awaiting placement in a longer-term placement facility.

552.    To increase the number of out-of-home placements of youth adjudicated delinquent, Ciavarella exerted pressure on staff of the Court of Common Pleas of Luzerne County to recommend detention of juveniles even when

detention was not appropriate.  Ciavarella at times pressured probation officers to change recommendations of release to recommendations of detention.  Even when probation officers did not recommend detention, Ciavarella often ordered youth detained.

553.   Because Ciavarella had a concealed financial interest in placing youth in detention, the adjudication of every juvenile adjudicated delinquent or referred for placement by him from February 2003 through May 2008 was tainted.  Each adjudication and placement occurred in violation of each child's constitutional right to be adjudicated by an impartial tribunal. Moreover, any order by Ciavarella concerning the disposition of a youth during that time period, even if the youth had been adjudicated delinquent prior to 2003 or by a different judge, was also tainted and violative of the youth's constitutional right to appear before an impartial tribunal.

554.   In spite of the clear mandate from the United States Supreme Court and Ciavarella's own pledge, the defendants' interest in this conspiracy also led Ciavarella to regularly deny many of the plaintiff youth, specifically Class B, herein represented by named plaintiffs H.T., B.W., Kevin Williamson, M.Y., R.S. and S.S., basic constitutional rights.  These rights include the right to appear before an impartial tribunal, the right to counsel, and the right to be advised of the consequences of waiving counsel or

entering a guilty plea such that waivers and pleas are knowing, intelligent and voluntary consistent with due process.

555.   The United States Constitution requires that valid guilty pleas must be knowing and voluntary because a guilty plea constitutes a waiver of the Fifth Amendment right against compulsory self-incrimination and the Sixth Amendment right to confront one's accusers.  It has been settled for more than forty years that these rights apply to youth in juvenile delinquency proceedings.  *See In re Gault*, 387 U.S. at 55, 56.  To enter into a knowing and voluntary guilty plea, a youth must be informed of and then must affirmatively state that he understands the consequences of pleading guilty and the rights he is giving up as a consequence thereof.  He must also admit to each and every element of the offenses with which he is charged.  The decision to plead guilty must be made freely and without threat or coercion.

556.   As a regular matter, Ciavarella took no steps to ensure that Class B plaintiffs' guilty pleas were knowing and voluntary as required.  He regularly failed to inform youth of their right to a trial, their right to confront and cross-examine witnesses, and the government's burden of proving every element of its case beyond a reasonable doubt.  He also regularly failed to ask if youth understood they were giving up these rights before pleading guilty.  Ciavarella did not confirm that youth understood

the acts to which they were pleading guilty.  In some cases, Ciavarella adjudicated youth delinquent without even inquiring as to the youth's plea of guilt or innocence, and he then placed the youth in a detention facility. At other times, even if the youth pled not guilty, Ciavarella adjudicated the youth delinquent in a hearing lasting no more than a few minutes, with no trial or opportunity for the youth to speak on his or her own behalf or to present testimony or evidence.

557.   Even when plaintiffs retained private counsel to represent them in their adjudicatory hearings before Ciavarella, Ciavarella regularly gave the privately retained counsel little or no opportunity to speak on behalf of their clients at the hearing.

558.   These gross violations of the youth plaintiffs' constitutional rights were part and parcel of the defendants' scheme to ensure that youth were adjudicated delinquent and placed in detention.  Denying plaintiffs these fundamental rights increased the number of youth adjudicated delinquent and placed in detention while, because of plaintiffs' lack of counsel, minimizing the likelihood that the adjudications and placement decisions would be questioned or appealed.

559.   Data from Luzerne County confirm that this strategy had an impact. According to data collected by the Juvenile Court Judges' Commission,

from 2003 through 2006 (the most recent year for which data is available),

the Luzerne County Juvenile Court handled 5,160 delinquency

dispositions; twenty-two percent of these dispositions resulted in

placement, almost double the Pennsylvania state average. *See*

Pennsylvania Juvenile Court Judges' Commission, *Pennsylvania Juvenile*

*Court Dispositions* (2003-2006), available at http://www.jcjc.state.pa.us/

jcjc/cwp/browse.asp?A=3&BMDRN=2000&BCOB=0&C=41835.

560.   In 2003, approximately seven percent of all children who waived counsel

in Pennsylvania were placed outside the home; in Luzerne County, more

than half of the children who waived counsel were placed outside the home

(177 of 301 total waivers).  In 2004, approximately twelve percent of all

children who waived counsel in Pennsylvania were placed outside the

home; in Luzerne County, over half of the children who waived counsel

were placed outside the home (132 of 252 total waivers).  Luzerne County

data from 2005 and 2006 show that more than 250 children who were

unrepresented at juvenile court hearings were adjudicated delinquent and

removed from their homes.  In Luzerne County, nearly sixty percent of

delinquency dispositions for youth without counsel in both 2005 and 2006

resulted in out-of-home placement.  Additionally, while the statewide

annual average for waiver of counsel in all counties was about five percent

during the period from 2003 to 2006, the average annual rate of waiver of counsel in Luzerne County ranged between thirteen percent (in 2003) and eighteen to nineteen percent (from 2004 through 2006).

561.  The foregoing actions of Ciavarella and Conahan, as well as other of their actions, related to matters in which they had discretionary decision-making authority.  Ciavarella and Conahan took these actions and other actions without recusing themselves from matters in which they had a conflict of interest and without disclosing to parties involved in court proceedings their conflict of interest and the financial relationship that existed between Ciavarella and Conahan, on the one hand, and Powell, Zappala, Mericle, PA Child Care, and Western PA Child Care, on the other hand, which were material matters.

562.  By failing to recuse themselves from acting in matters in which they had a material conflict of interest and by failing to disclose to parties appearing before the court their conflict of interest and their financial relationship with Powell, Mericle, Zappala, PA Child Care, and Western PA Child Care, which were material matters, Ciavarella and Conahan violated their duties of independence, impartiality, and integrity in the exercise of their discretionary actions on behalf of the Court of Common Pleas for Luzerne County.

563.   As a result of unconstitutional adjudications and placements described above, youth plaintiffs suffered emotional trauma and all plaintiffs – youth and their parents or guardians – were forced to pay the costs or some portion of the costs of placement at PA Child Care, Western PA Child Care, or other facilities, as well as other court costs, probation fees, fines, restitution, and attorneys' fees.

564.   On January 26, 2009, the United States Attorney for the Middle District of Pennsylvania filed a Bill of Information alleging two counts of fraud against Ciavarella and Conahan.  The Bill of Information describes, *inter alia*, a conspiracy among the judges and at least two other unnamed parties, presumed to be Powell and Mericle, to conceal $2.6 million in payments to the judges from owners of juvenile correctional facilities, in exchange for, *inter alia*, referring children who appeared before Ciavarella to these juvenile correctional facilities.  On February 12, 2009, Ciavarella and Conahan pled guilty to these counts.  In their guilty pleas, Ciavarella and Conahan agreed to serve more than seven years in federal prison.  A formal sentencing hearing is pending, following a federal pre-sentence investigation.

565.   On February 11, 2009, the Pennsylvania Supreme Court assumed plenary jurisdiction and granted Juvenile Law Center's Amended Application for

the Exercise of King's Bench Power or Extraordinary Jurisdiction arising out of Ciavarella's denial of youth's constitutional right to counsel and acceptance of guilty pleas without due process during the period from 2003 through May 2008.  Pursuant to that order, and citing the recently revealed criminal allegations and plea agreement entered into by Ciavarella, among others, the court appointed Special Master Arthur Grim, Senior Judge, Berks County Court of Common Pleas, to act on its behalf.  Specifically, the court authorized Judge Grim to review all juvenile court adjudications and dispositions affected by the recently revealed criminal charges, including all cases in which children were committed to PA Child Care and Western PA Child Care, as well as all cases in which it is alleged that youth appearing before Ciavarella were denied their right to counsel, and to make recommendations to the court concerning appropriate remedial actions.

566.   Among the remedial actions the Special Master may recommend, on an individual basis, class basis, or both, are orders to expunge records, grant new juvenile proceedings, or find that the affected juvenile proceedings were void *ab initio*.  The request for relief was limited to injunctive or other equitable relief.

**D.     FINANCIAL TRANSACTIONS IN FURTHERANCE OF THE CONSPIRACY**

567.    Defendants Ciavarella, Conahan, Powell, Zappala, and Mericle entered into agreements for constructing and guaranteeing placements in the PA Child Care and Western PA Child Care facilities in return for concealed payments to Ciavarella and Conahan.

568.    In or before January 2003, Ciavarella and Conahan arranged with Powell and Mericle to receive a payment from Powell and Mericle in the amount of $997,600 to compensate them for the roles they played in accomplishing the construction of the PA Child Care facility.

569.    In order to conceal the $997,600 payment, Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mericle and backdated to February 19, 2002, which purported to be an agreement for Mericle to pay a broker's fee of $997,600 to Powell.  In fact, however, a large portion of the money was intended to be paid to Ciavarella and Conahan.

570.    Ciavarella and Conahan engaged in a series of financial transactions, over time, which were also designed to conceal the $997,600 payment made to them.  On January 21, 2003, Mericle wire transferred $610,000 to an attorney trust account of an attorney other than Powell.  The remaining

119

$387,600 was wire transferred by Mericle to a bank account under the control of Powell.

571.   Thereafter, on January 28, 2003, the $610,000 in the attorney trust account was wire transferred to a bank account of defendant Beverage Marketing of Pennsylvania, a business entity controlled by Conahan.

572.   In a series of financial transactions thereafter, a portion of the $610,000 payment was passed from Conahan to Ciavarella.  For example, on or about January 28, 2003, Conahan directed that $330,000 of the $610,000 be wire transferred to a bank account controlled by Ciavarella; on or about April 30, 2003, Conahan directed that an additional $75,000 of the $610,000 be wire transferred to a bank account controlled by Ciavarella; on or about July 15, 2003, Conahan directed that an additional $75,000 of the $610,000 be wire transferred to a bank account under the control of Ciavarella; on or about August 13, 2003, Conahan directed that an additional $25,000 of the $610,000 be wire transferred to a bank account under the control of a third party; and, on or about August 20, 2003, Conahan directed that an additional $105,000 be transferred to a bank account under the control of Conahan.

573.   To conceal the payments to Ciavarella and Conahan, Conahan directed that false entries be made in the books and records of Beverage Marketing of

Pennsylvania.  That direction was followed, and false entries were in fact made in the books and records of Beverage Marketing of Pennsylvania.

574.    To further conceal the $997,600 payment made to Ciavarella and Conahan, a portion of the $387,600 wire transfer made by Mericle to Powell on January 28, 2003 was paid to Ciavarella and Conahan in a series of financial transactions which occurred over time.  One of those transactions occurred on or about August 29, 2003, when a check in the amount of $326,000, drawn on a bank account under the control of Powell, was deposited into a bank account under the control of Conahan but maintained in the name of another person.

575.    With respect to the $1,000,000 payment made by Powell to Ciavarella and Conahan in July 2005, after completion of the construction of Western PA Child Care, defendants attempted to hide the compensation they paid, transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and/or Beverage Marketing, and by creating false records and/or by causing false records to be created.

576.    In order to conceal the payment to Ciavarella and Conahan, Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mericle which purported to be an agreement for Mericle to pay a broker's fee of $1,000,000 to Powell.  In fact, however, the money was

wire transferred by Mericle to a bank account of the Pinnacle Group, a business entity owned by defendants Cindy Ciavarella and Barbara Conahan, but controlled by Mark Ciavarella and Michael Conahan.

577.   With respect to the $150,000 payment made to Ciavarella and Conahan by Powell and Mericle in February 2006 upon completion of the construction of an addition to PA Child Care by Mericle, the same contractor who built the facility, defendants attempted to hide the compensation they paid, transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and/or Beverage Marketing, and by creating false records and/or by causing false records to be created.

578.   Specifically, in order to conceal the payment to Ciavarella and Conahan, Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mericle, which purported to be an agreement for Mericle to pay a broker's fee of $150,000 to Powell.  In fact, however, the money was wire transferred by Mericle to a bank account of the Pinnacle Group, a business entity owned by Cindy Ciavarella and Barbara Conahan, but controlled by Mark Ciavarella and Michael Conahan.

579.   Between approximately February of 2003 and January 1, 2007, Ciavarella and Conahan received from Powell hundreds of thousands of dollars in payments for their past and future official actions relating to PA Child Care

and Western PA Child Care.  Again, they took steps to conceal and

disguise the existence, nature, location, source, ownership, and control of

these payments.

580.   Some of the payments were made by checks drawn on one or more bank

accounts under the control of Powell and were made payable to Pinnacle

Group.  The payments included, but were not necessarily limited to, the

following:  $18,000 paid on or about January 13, 2004; $52,000 paid on or

about January 13, 2004; $78,000 paid on or about February 15, 2004;

$75,000 paid on or about February 15, 2004; $47,000 paid on or about

February 15, 2004; $75,000 paid on or about April 30, 2004; and $25,000

paid on or about April 30, 2004.

581.   To conceal the payments to Ciavarella and Conahan, Powell made false

notations on the checks and Ciavarella and Conahan directed that false

entries be made in the books and records of Pinnacle Group.  False entries

were made in the books and records of Pinnacle Group.

582.    In addition to payments by check, some of the payments were made by

wire transfers from one or more bank accounts under the control of Powell

and transferred to an account of Pinnacle Group.  The payments included,

but were not necessarily limited to, the following:  $120,000 transferred on

July 12, 2004; and $100,000 transferred on September 23, 2004.

583.   In order to conceal the more than $2.6 million in unlawful payments they received, Ciavarella and Conahan knowingly and intentionally filed materially false annual statements of financial interests with the Administrative Office of the Pennsylvania Courts, in which they failed to disclose the source of these payments, the source of the income they received, and their financial relationship with Powell, Zappala, Mericle, PA Child Care and Western PA Child Care, all of which were material matters.

584.   Ciavarella made the following materially false filings with the Administrative Office of the Pennsylvania Courts on or about the following dates:

(a)   April 2004:  Materially false annual statement of financial interests for calendar year 2003 submitted to the Pennsylvania Administrative Office of the Courts;

(b)   March 2005:  Materially false annual statement of financial interests for calendar year 2004 submitted to the Pennsylvania Administrative Office of the Courts;

(c)   April 2006:  Materially false annual statement of financial interests for calendar year 2005 submitted to the Pennsylvania Administrative Office of the Courts; and

(d)     March 2007:  Materially false annual statement of financial interests for calendar year 2006 submitted to the Pennsylvania Administrative Office of the Courts.

585.    Conahan made the following materially false filings with the Administrative Office of the Pennsylvania Courts on or about the following dates:

(a)     April 2004:  Materially false annual statement of financial interests for calendar year 2003 submitted to the Pennsylvania Administrative Office of the Courts;

(b)     March 2005:  Materially false annual statement of financial interests for calendar year 2004 submitted to the Pennsylvania Administrative Office of the Courts;

(c)     February 2006:  Materially false annual statement of financial interests for calendar year 2005 submitted to the Pennsylvania Administrative Office of the Courts; and

(d)     April 2007:  Materially false annual statement of financial interests for calendar year 2006 submitted to the Pennsylvania Administrative Office of the Courts.

586.    Furthermore, Ciavarella and Conahan, acting on behalf of the Court of Common Pleas for Luzerne County in matters in which they had

discretionary decision-making authority, knowingly and intentionally

issued written, oral and wire communications which were materially false

to the extent that the defendants did not disclose their sources of income,

their conflict of interest, and their financial relationship with Powell,

Zappala, Mericle, PA Child Care, and Western PA Child Care, which were

material matters.

## CLAIMS

## COUNT I

**VIOLATION OF PLAINTIFFS' RIGHT TO AN
IMPARTIAL TRIBUNAL PURSUANT TO THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

**All Youth Plaintiffs (Class A and Class B)
v. Defendants Ciavarella and Conahan**

587.   Each of the preceding paragraphs is incorporated herein.

588.   Ciavarella and Conahan are "persons" within the meaning of 42 U.S.C.

§ 1983.

589.   Ciavarella and Conahan were acting "under color of state law" and their

conduct was subject to 42 U.S.C. § 1983.

590.   Ciavarella and Conahan received payments by and through the other

defendants in connection with the construction of new detention facilities.

In return for these payments, Ciavarella and Conahan agreed to and did use

their judicial offices to ensure that detention facilities would be constructed

and expanded and that plaintiff youth would be placed in detention. Ciavarella and Conahan knowingly hid these payments from the County of Luzerne, the Administrative Office of the Pennsylvania Courts, and the public – in particular the named plaintiffs and class members – thereby concealing Ciavarella's and Conahan's conflicts of interest, pecuniary interest, bias, and partiality in adjudicating plaintiff youth delinquent and ordering their placement in detention facilities.

591.   Because of these actions, plaintiff youth were deprived of their right to an impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

592.   As a result of their actions, the United States Attorney filed a Bill of Information alleging two counts of fraud against Ciavarella and Conahan. As described above, the Bill of Information describes, *inter alia*, a conspiracy among the judges and unnamed parties to conceal $2.6 million in payments to the judges from owners of juvenile correctional facilities, in exchange for, *inter alia*, referring children who appeared before Ciavarella to these juvenile correctional facilities.  On February 12, 2009, Ciavarella and Conahan pled guilty to these two counts of fraud.

593.   As a result of these constitutional violations, plaintiffs suffered injuries and damages, including but not limited to emotional trauma and costs, fines,

fees, and other expenses arising out of their unconstitutional adjudications or placement.

## COUNT II

### CONSPIRACY TO VIOLATE PLAINTIFFS' RIGHT TO AN IMPARTIAL TRIBUNAL PURSUANT TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

### All Youth Plaintiffs (Class A and Class B) v. All Defendants

594.    Each of the preceding paragraphs is incorporated herein.

595.    Each defendant is a "person" within the meaning of 42 U.S.C. § 1983.

596.    All defendants were acting "under color of state law" and their conduct was subject to 42 U.S.C. § 1983.

597.    Defendants knowingly and willfully entered into a conspiracy and agreement by which Ciavarella and Conahan would and did receive payments by and through the other defendants in connection with the construction of new detention facilities.  In return for these payments, Ciavarella and Conahan agreed to and did use their judicial offices to ensure that plaintiff youth would be placed in detention facilities by, *inter alia*, securing a contract from Luzerne County to use these facilities and ordering placement of plaintiffs in these facilities.  All defendants knowingly hid these payments from the County of Luzerne, the Administrative Office of the Pennsylvania Courts, and the public – in

particular the named plaintiffs and class of youth they represent – thereby

concealing the defendants' conflict of interest, pecuniary interest, bias, and

partiality in adjudicating plaintiff youth delinquent and ordering their

placement in detention facilities.

598.   Because of this conspiracy, plaintiff youth therefore were deprived of their

right to an impartial tribunal as guaranteed by the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution.

599.   As a result of these constitutional violations, plaintiffs suffered injuries and

damages, including but not limited to emotional trauma and costs, fines,

fees, and other expenses arising out of their unconstitutional adjudications

or detention.

## COUNT III

**DEPRIVATION OF PLAINTIFFS' RIGHT TO COUNSEL
AND TO A KNOWING, INTELLIGENT, AND
VOLUNTARY GUILTY PLEA IN VIOLATION OF THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

### Class B Plaintiffs v. Defendant Ciavarella

600.   Each of the preceding paragraphs is incorporated herein.

601.   Ciavarella is a "person" within the meaning of 42 U.S.C. § 1983.

602.   Ciavarella was acting "under color of state law" and his conduct was

subject to 42 U.S.C. § 1983.

603.    Ciavarella received payments by and through the other defendants in

connection with the construction of new detention facilities.  In return for

these payments, Ciavarella agreed to use his judicial office to ensure that

plaintiff youth would be placed in detention facilities.

604.    Ciavarella denied Class B plaintiffs their constitutionally protected right to

counsel.  When Class B plaintiffs appeared before Ciavarella without an

attorney, he failed to inquire as to whether they were knowingly,

intelligently, and voluntarily waiving their right to counsel, as required by

the Sixth and Fourteenth Amendments to the United States Constitution.

This denial substantially enhanced Ciavarella's ability to adjudicate the

Class B plaintiffs as delinquent and place them in detention facilities.

605.    Ciavarella failed to engage in any colloquy with Class B plaintiffs pleading

guilty to ensure that their admissions and guilty pleas were knowing and

voluntary.  Ensuring that a guilty plea is knowing, intelligent, and

voluntary is constitutionally required because a guilty plea constitutes a

waiver of important constitutional rights, including the Fifth Amendment

right against compulsory self-incrimination and the Sixth Amendment right

to a trial and to confront one's accusers.  Ciavarella's denial of these rights

to Class B plaintiffs significantly enhanced his ability to adjudicate the

Class B youth as delinquent and place them in detention facilities.

## COUNT IV

**CONSPIRACY TO DEPRIVE YOUTH OF THEIR RIGHT TO
COUNSEL AND TO A KNOWING, INTELLIGENT, AND
VOLUNTARY GUILTY PLEA IN VIOLATION OF THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

### Class B Plaintiffs v. All Defendants

606.    Each of the preceding paragraphs is incorporated herein.

607.    Each defendant is a "person" within the meaning of 42 U.S.C. § 1983.

608.    All defendants were acting "under color of state law" and their conduct was

subject to 42 U.S.C. § 1983.

609.    Defendants knowingly and willfully entered into an agreement by which

Ciavarella and Conahan would receive payments by and through the other

defendants in connection with the construction of new detention facilities.

In return for these payments, Ciavarella and Conahan agreed to use their

judicial offices to ensure that plaintiff youth would be placed in detention

facilities.  All defendants knowingly hid these payments from the County

of Luzerne, the Administrative Office of the Pennsylvania Courts, and the

public – in particular the plaintiffs – thereby concealing the defendants'

conflict of interest, pecuniary interest, bias and partiality in adjudicating

plaintiff youth and placing plaintiff youth in detention facilities.

610.    As part of this conspiracy and agreement, Ciavarella denied Class B

plaintiffs their constitutionally protected right to counsel.  When Class B

plaintiffs appeared before Ciavarella without an attorney, he failed to inquire as to whether the youth were knowingly, intelligently, and voluntarily waiving their right to counsel, as required by the Sixth and Fourteenth Amendments to the United States Constitution.  This denial substantially enhanced Ciavarella's ability, pursuant to the conspiracy, to adjudicate the Class B plaintiff youth as delinquent and to order their placement in detention facilities.

611.   As part of this conspiracy and agreement, defendant Ciavarella failed to engage in any colloquy with Class B plaintiff youth pleading guilty to ensure that the Class B plaintiff youth's admissions and guilty pleas were knowing and voluntary.  Ensuring that a guilty plea is knowing, intelligent, and voluntary is constitutionally required because a guilty plea constitutes a waiver of important constitutional rights, including the Fifth Amendment right against compulsory self-incrimination and the Sixth Amendment right to a trial and to confront one's accusers.  Ciavarella's denial of these rights to Class B youth significantly enhanced his ability, pursuant to the conspiracy, to adjudicate Class B youth delinquent and order their placement in detention facilities.

132

## COUNT V

## CIVIL RICO (18 U.S.C. § 1962(c))

### Class C Plaintiffs v. All Defendants

612.   Each of the preceding paragraphs is incorporated herein.

613.   Each youth or parent plaintiff who paid money as a result of his or her

having been adjudicated delinquent or placed by Ciavarella, or his or her

child having been adjudicated delinquent or placed by Ciavarella, between

2003 and May 23, 2008 is a "person" as that term is defined in 18 U.S.C.

§ 1961(3).

614.   Each defendant is a "person" as that term is defined in 18 U.S.C. § 1961(3).

615.   Ciavarella, Conahan, PA Child Care, Western PA Child Care, Powell,

Zappala, Mericle, and Mericle Construction together constituted an

association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4).

616.   This enterprise, an ongoing organization that functioned as a continuing

unit for the purpose of adjudicating and housing juveniles adjudicated

delinquent in Luzerne County and elsewhere, at all times relevant hereto

was engaged in interstate commerce or its activities affected interstate

commerce.

617.   Specifically, on or about each date listed below, in the Middle District of

Pennsylvania and elsewhere, Ciavarella and Conahan, aided and abetted by

each other and other defendants for the purpose of executing the scheme to

defraud and the conspiracy to violate plaintiffs' constitutional rights described herein, transmitted and/or caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals and sounds:

(a)     July 12, 2004:  Electronic funds transfer of $120,000 transferred from an account of Vision Holdings to an account of the Pinnacle Group;

(b)     September 23, 2004:  Electronic funds transfer of $100,000 transferred from an account of Vision Holdings to an account of Pinnacle Group;

(c)     July 15, 2005:  Electronic funds transfer of $1,000,000 transferred from an account of Mericle Construction to an account of Pinnacle Group; and

(d)     February 3, 2006:  Electronic funds transfer of $150,000 transferred from an account of Mericle Construction to an account of Pinnacle Group.

618.    Each defendant, along with others known and unknown, was employed by or associated with the enterprise identified in paragraphs 615 and 616.

619.    Each defendant, along with others known and unknown, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs

through a pattern of racketeering activity, in violation of 18 U.S.C.

§ 1962(c).

620.     The pattern of racketeering activity, which each defendant conducted or in

which each defendant participated, included the following "racketeering

acts" within the meaning of 18 U.S.C. § 1961(1) which occurred from in or

about June 2000 to on or about April 30, 2007:

(a)     Devising or intending to devise a scheme or artifice to defraud by

means of wire communication in interstate commerce, in violation of

18 U.S.C. § 1343, in particular as described above, including,

without limitation, in Parts B and D;

(b)     Devising or intending to devise a scheme or artifice to defraud the

citizens of the Commonwealth of Pennsylvania, including plaintiffs,

and to deprive those citizens – and particularly plaintiffs – of the

intangible right of honest services by means of wire communication

in interstate commerce, in violation of 18 U.S.C. §§ 1343 and 1346,

in particular as described above, including, without limitation, in

Parts B and D;

(c)     Offering, conferring, or agreeing to confer on another a pecuniary

benefit as consideration for the decision, opinion, recommendation,

or other exercise of discretion as a public servant by the recipient, in

violation of 18 Pa. Cons. Stat. § 4701(a)(1), in particular as described above, including, without limitation, in Parts B and D;

(d)     Soliciting, accepting, or agreeing to accept from another a pecuniary benefit as consideration for the decision, opinion, recommendation, or other exercise of discretion as a public servant by the recipient, in violation of 18 Pa. Cons. Stat. § 4701(a)(1), in particular as described above, including without limitation, in Parts B and D; and

(e)     Soliciting, accepting, or agreeing to accept from another any benefit as consideration for a violation of a known legal duty as public servant, in violation of 18 Pa. Cons. Stat. § 4701(a)(3), in particular as described above, including without limitation, in Parts B and D.

621.   The aforementioned instances of racketeering activity constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).  The aforementioned acts occurred continuously from on or about June 2000 to on or about April 30, 2007, as part of defendants' regular way of conducting and participating in the ongoing RICO enterprise.  These acts had the same or similar participants, victims, and method of commission.  Specifically, these acts were all related to the common purpose of enriching various defendants by constructing and expanding juvenile detention facilities, namely PA Child Care and Western PA Child Care; contracting

136

with Luzerne County to use those juvenile detention facilities; and keeping the beds at PA Child Care and Western PA Child Care full.  These purposes were accomplished by denying youth who appeared before Ciavarella the right to an impartial judiciary, by obtaining guilty pleas from youth who appeared before Ciavarella in violation of the juveniles' due process rights, and by denying youth who appeared before Ciavarella the right to assistance of counsel.

622.     Ciavarella and Conahan accepted compensation from and/or through PA Child Care, Western PA Child Care, Mid-Atlantic Youth Services, Mericle, Mericle Construction, Zappala, Pinnacle Group, Beverage Marketing of Pennsylvania, and Vision Holdings in exchange for official actions.

623.     Additionally, defendants attempted to hide the compensation they paid, transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and Beverage Marketing, by creating false records, and/or by causing false records to be created.

624.     As a direct and proximate result and by reason of each of the defendants' conduct of or participation in the affairs of the previously described enterprise, along with others known and unknown, the Class C plaintiffs have been injured in their business or property.

625.     Such injuries consist, *inter alia*, of the following:

(a)     Payments made by the youth plaintiffs and/or the parent plaintiffs to

defense attorneys;

(b)     Payments made by the youth plaintiffs and/or the parent plaintiffs to

Luzerne County for the cost of placements, court costs and fees, and

costs for probation; and

(c)     Loss of the youth plaintiffs' employment, scholarships, and/or

financial aid as a result of the youth plaintiffs having been

adjudicated delinquent and/or committed to PA Child Care, Western

PA Child Care, or other juvenile detention facilities.

626.   The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

## COUNT VI

## CIVIL RICO (18 U.S.C. § 1962(b))

## Class C Plaintiffs v. All Defendants

627.   Each of the preceding paragraphs is incorporated herein.

628.   The defendants, along with others known and unknown, acquired and

maintained interests in and control of the enterprise identified in paragraphs

615 and 616, *supra*, through their pattern of racketeering activity, in

violation of 18 U.S.C. § 1962(b).

629.   They did so through a pattern of violations of 18 U.S.C. §§ 1343 and 1346

and 18 Pa. Cons. Stat. § 4701(a)(1) and (3) in constructing juvenile

detention facilities, namely PA Child Care and Western PA Child Care; in

contracting with Luzerne County to use those juvenile detention facilities;

and in keeping the beds at PA Child Care  and Western PA Child Care full.

630. As a direct and proximate result and by reason of each of the defendants'

acquisition and maintenance of interests in and control of the enterprise, the

constitutional rights of youth plaintiffs who appeared before Ciavarella to

due process, counsel, and an impartial judiciary were violated.

631. As a direct and proximate result and by reason of each of the defendants'

acquisition and maintenance of interests in and control of the enterprise, the

plaintiffs have been injured in their business or property.

632. Such injuries consist, *inter alia*, of the following:

   (a)   Payments made by the youth plaintiffs and/or the parent plaintiffs to

         defense attorneys;

   (b)   Payments made by the youth plaintiffs and/or the parent plaintiffs to

         Luzerne County for the cost of placements, court costs and fees, and

         costs for probation; and

   (c)   Loss of employment, scholarships, and/or financial aid as a result of

         the youth plaintiffs having been adjudicated delinquent and/or

         committed to PA Child Care, Western PA Child Care, or other

         juvenile detention facilities.

633.    The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

### COUNT VII

### CIVIL RICO (18 U.S.C. § 1962(d))

### Class C Plaintiffs v. All Defendants

634.    Each of the preceding paragraphs is incorporated herein.

635.    As set forth above, defendants agreed and conspired to violate 18 U.S.C.

§ 1962(b) and (c), all in violation of 18 U.S.C. § 1962(d).

636.    In particular, the defendants intentionally conspired and agreed to acquire

or maintain interests in and control of the enterprise through a pattern of

racketeering activity, as described in Count VI.  Additionally, the

defendants intentionally conspired and agreed to conduct and participate in

the conduct of the affairs of the enterprise through a pattern of racketeering

activity, as described in Count V.

637.    The defendants took overt acts in furtherance of the conspiracy as

described above including, but not limited to, those acts described in

Counts V and VI.

638.    The defendants knew that their predicate acts were part of a pattern of

racketeering activity, and the defendants agreed to the commission of those

acts to further the schemes described in Counts V and VI.

639.   As a direct and proximate result of the defendants' conspiracy, the overt

acts taken in furtherance of that conspiracy, and violations of 18 U.S.C.

§ 1962(b) and (c), the plaintiffs have been injured in their business or

property.

640.   Such injuries consist, *inter alia*, of the following:

(a)   Payments made by the youth plaintiffs and/or the parent plaintiffs to

defense attorneys;

(b)   Payments made by the youth plaintiffs and/or the parent plaintiffs for

the costs of placements, court costs and fees, costs for probation; and

(c)   Loss of the youth plaintiffs' employment, scholarships, and/or

financial aid as a result of the youth plaintiffs having been

adjudicated delinquent and/or committed to PA Child Care, Western

PA Child Care, or other juvenile detention facilities.

641.   The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

1.     Assume jurisdiction of this action.

2.     Certify this action as a class action.

3.     Award compensatory and punitive damages in an amount in excess of
$150,000 exclusive of interest and costs.

4.     Award threefold damages in accordance with 18 U.S.C. § 1964(b)-(c).

5.     Award prejudgment interest, costs of suit, and attorneys' fees.

6.     Order disgorgement and restitution of moneys obtained by defendants as a
result of their conspiracy to violate plaintiffs' constitutional rights.

7.     Order such other and further relief as this court deems just and proper.

Respectfully submitted,

s/ Lourdes M. Rosado
Marsha L. Levick, Esq. (PA 22535)
Lourdes M. Rosado, Esq. (PA 77109)
JUVENILE LAW CENTER
1315 Walnut Street, Suite 400
Philadelphia, PA 19107
(215) 625-0551

Daniel Segal, Esq. (PA 26218)
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Counsel for Plaintiffs*

142